## EXHIBIT A

**Combined Plan and Disclosure Statement**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>TONOPAH SOLAR ENERGY, LLC,[1]<br><br>  Debtor. | Chapter 11<br><br>Case No. 26-10060 (JKS) |

## COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN

**THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT ON AN INTERIM BASIS FOR SOLICITATION AND IS SUBJECT TO FINAL APPROVAL BY THE BANKRUPTCY COURT AT THE COMBINED HEARING.**

**DLA PIPER LLP (US)**

Aaron S. Applebaum (DE 5587)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: aaron.applebaum@us.dlapiper.com

David M. Riley (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile: (917) 778-8624
Email: david.riley@us.dlapiper.com

**DEBEVOISE & PLIMPTON LLP**

Rachel Ehrlich Albanese (admitted *pro hac vice*)
66 Hudson Boulevard
New York, New York 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
Email: ralbanese@debevoise.com

Dated: May 14, 2026

*Counsel for the Debtor*

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number, is Tonopah Solar Energy, LLC (1316). The Debtor's headquarters is located at 11 Gabbs Pole Line Road, Box 1071, Tonopah, NV 89049.

**TABLE OF CONTENTS**

**Page**

Article I DEFINED TERMS AND RULES OF INTERPRETATION ..................................... 2

    1.1    **Defined Terms.** ................................................................................................. 2

    1.2    **Rules of Interpretation.** ................................................................................ 16

    1.3    **Rules of Construction.** .................................................................................. 17

Article II TREATMENT OF UNCLASSIFIED CLAIMS ............................................... 17

    2.1    **Administrative Claims, Priority Tax Claims, and U.S. Trustee Fees.** .................... 17

    2.2    **DIP Claims.** ................................................................................................. 18

    2.3    **Professional Fee Claims.** .............................................................................. 19

Article III CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED
RECOVERIES ............................................................................................................... 20

    3.1    **General Rules of Classification.** ................................................................... 20

Article IV BACKGROUND AND DISCLOSURES ...................................................... 25

    4.1    **General Background.** ................................................................................... 25

    4.2    **Overview of the Debtor's Prepetition Debt.** ................................................ 32

    4.3    **Prepetition Indemnification Obligations** ...................................................... 32

    4.4    **The Debtor's Chapter 11 Case.** .................................................................... 32

Article V CONFIRMATION AND VOTING PROCEDURES ........................................ 39

    5.1    **Confirmation Procedure.** ............................................................................. 39

    5.2    **Procedure for Objections.** ........................................................................... 39

    5.3    **Requirements for Confirmation.** ................................................................. 39

    5.4    **Classification of Claims and Interests.** ........................................................ 40

    5.5    **Impaired Claims or Interests.** ...................................................................... 41

    5.6    **Special Provision Governing Unimpaired Claims.** ........................................ 42

    5.7    **Confirmation without Necessary Acceptances** .............................................. 42

    5.8    **Feasibility** ................................................................................................... 43

    5.9    **Best Interests Test and Liquidation Analysis** ................................................ 43

    5.10    **Releases & Exculpations** .............................................................................. 44

    5.11    **Acceptance of the Plan** ................................................................................ 45

Article VI CERTAIN RISK FACTORS TO BE CONSIDERED ..................................... 45

    6.1    **The Plan May Not Be Accepted.** .................................................................. 45

    6.2    **The Plan May Not Be Confirmed.** ................................................................ 46

6.3 **Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections.** ..... 46

6.4 **The Bankruptcy Court May Disagree with the Classification of Claims.** ..... 46

6.5 **Failure to Consummate the Plan.** ..... 47

6.6 **Plan Releases May Not Be Approved.** ..... 47

6.7 **Risks upon Confirmation.** ..... 47

6.8 **The Chapter 11 Case May be Converted to Chapter 7, or a Chapter 11 Trustee May be Appointed.** ..... 47

6.9 **Certain Tax Considerations.** ..... 48

Article VII MEANS OF IMPLEMENTING THE PLAN ..... 54

7.1 **General.** ..... 54

7.2 **Sale Transaction & Sources of Consideration for Plan Distributions** ..... 55

7.3 **Wind-Down Debtor** ..... 55

7.4 **Funding of the General Unsecured Convenience Class Claim Fund.** ..... 56

7.5 **The Former Manager Settlement.** ..... 56

7.6 **Wind-Down.** ..... 56

7.7 **Approval and Authorization of Corporate and Company Action.** ..... 57

7.8 **Plan Administrator.** ..... 57

7.9 **Cancellation of Existing Securities and Agreements.** ..... 60

7.10 **Exemption from Certain Transfer Taxes.** ..... 61

7.11 **Preservation of Retained Actions.** ..... 61

7.12 **Dissolution of the Wind-Down Debtor.** ..... 62

Article VIII SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ..... 62

8.1 **Release of Liens.** ..... 62

8.2 **Releases by the Debtor.** ..... 63

8.3 **Third-Party Release.** ..... 64

8.4 **Exculpation.** ..... 65

8.5 **No Liability Pursuant to Section 1125(e) of the Bankruptcy Code** ..... 65

8.6 **Injunction.** ..... 65

8.7 **Consensual Non-Debtor Releases** ..... 66

8.8 **Indemnification Obligations** ..... 66

8.9 **Setoffs** ..... 67

8.10 **Binding Effect** ..... 67

8.11 **Terms of Injunctions or Stays** ..... 67

Article IX EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..... 67

9.1 **Rejection of Executory Contracts and Unexpired Leases** ....................................... 67

9.2 **Supplemental Bar Date for Rejection Damages** ....................................... 68

Article X DISTRIBUTIONS ....................................... 68

10.1 **Distributions for Claims Allowed as of the Effective Date** ....................................... 68

10.2 **No Distributions on Disputed Claims** ....................................... 68

10.3 **Distributions on Claims Allowed after the Effective Date** ....................................... 68

10.4 **Objections to and Estimation of Claims** ....................................... 69

10.5 **Delivery of Distributions and Undeliverable or Unclaimed Distributions** ........... 69

10.6 **Interest on Claims** ....................................... 70

10.7 **Withholding and Reporting Requirements** ....................................... 70

10.8 **Miscellaneous Distribution Provisions.** ....................................... 71

10.9 *De Minimis Distribution Provisions* ....................................... 71

10.10 **Distribution Record Date** ....................................... 71

Article XI CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ................. 71

11.1 **Conditions to Effective Date** ....................................... 71

11.2 **Substantial Consummation** ....................................... 72

11.3 **Consequences of Non-Occurrence of Effective Date** ....................................... 72

Article XII ADMINISTRATIVE PROVISIONS ....................................... 72

12.1 **Retention of Jurisdiction** ....................................... 72

12.2 **Amendments.** ....................................... 74

12.3 **Withdrawal of Plan** ....................................... 74

12.4 **Successors and Assigns** ....................................... 75

12.5 **Governing Law** ....................................... 75

12.6 **Corporate Action** ....................................... 75

12.7 **Effectuating Documents and Further Transactions** ....................................... 75

12.8 **Confirmation Order and Plan Control** ....................................... 75

12.9 **Notices** ....................................... 76

12.10 **No Admissions or Waiver** ....................................... 76

**Exhibit A: Liquidation Analysis**
**Exhibit B: Former Manager Settlement**
**Exhibit C: Organizational Chart**

## DISCLAIMER

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DOCUMENT.

NOTHING STATED IN THIS DOCUMENT MAY BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED IN THIS DOCUMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS IN THIS DOCUMENT ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN WILL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN WHAT IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTOR, OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED IN THIS DOCUMENT SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3016(b), AND LOCAL RULES 3017-1 AND 3017-2, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.

SEE Article VI OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.

## INTRODUCTION

Debtor Tonopah Solar Energy, LLC, as debtor in possession in this Chapter 11 Case, proposes this Combined Disclosure Statement and Plan for the treatment of Allowed Claims and Interests against the Debtor. The Debtor is the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

This Combined Disclosure Statement and Plan contains, among other things, a discussion of the Debtor's history (including its 2020 Chapter 11 Case), business, assets, operations, the Chapter 11 Case, risk factors, summary and analysis of this Plan, and certain other related matters.

The Debtor commenced this Chapter 11 Case to facilitate and finish its marketing process and consummate a value-maximizing, going concern transaction for substantially all of its assets. This Chapter 11 Case is intended to address financial and operational challenges related to the Power Plant, and to effectuate a sale of the Debtor's assets. The Plan is the best vehicle to conclude the Chapter 11 Case following a sale and to effectuate the Wind-Down.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR THAT ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY AND TO CONSULT WITH AN ATTORNEY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND IN THE PLAN, THE DEBTOR RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE, OR WITHDRAW THE PLAN, OR ANY PART THEREOF, PRIOR TO ITS SUBSTANTIAL CONSUMMATION.

## ARTICLE I
## DEFINED TERMS AND RULES OF INTERPRETATION

1.1    **Defined Terms**

1.    "1125(e) Parties" means collectively, and in each case in its capacity as such, the Debtor and the Related Parties of the Debtor.

2.    "2020 Chapter 11 Case" has the meaning given to it in Section 4.1.

3.    "2020 Confirmation Order" means the *Findings of Fact, Conclusions of Law and Order Confirming Chapter 11 Plan for Tonopah Solar Energy, LLC* entered on the docket of the 2020 Chapter 11 Case at D.I. 291.

4.    "2020 Plan" has the meaning given to it in Section 4.1.

2

5.      "ACSIA" means ACS Industrial Activities, Inc. (f/k/a Cobra Industrial Services, Inc.).

6.      "Administrative Claim" means an unsecured Claim for payment of costs or expenses of administration specified in Bankruptcy Code sections 503(b), 507(a)(2), 507(b), or 1114(e)(2), including: (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Debtor's estate and operating the business of the Debtor; and (b) Professional Fee Claims.

7.      "Administrative Claim Bar Date" means the deadline for filing requests for payment of Administrative Claims (other than requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), which will be the date that is forty-five (45) days after the Effective Date.

8.      "Affiliate" means "affiliate" as defined in section 101(2) of the Bankruptcy Code.

9.      "Allowed" means with respect to any Claim, except as otherwise provided in the Plan: (a) a Claim that is either (i) scheduled by the Debtor in its Schedules in a liquidated amount and not listed as contingent, unliquidated, zero, undetermined, or disputed; or (ii) asserted in this Chapter 11 Case by a proof of claim which has been timely filed, or deemed timely filed, with the Claims Agent in accordance with the procedures set forth in the Bar Date Order or late filed with leave of the Bankruptcy Court; and (b) a Claim that is either (i) not objected to within the period fixed by the Bankruptcy Code, the Bankruptcy Rules, and/or applicable orders of the Bankruptcy Court; or (ii) that has otherwise been allowed by a final order or pursuant to the Plan. An Allowed Claim: (y) includes a previously Disputed Claim to the extent such Disputed Claim becomes allowed when the context so requires, and (z) is net of any valid setoff amount, which amount will be deemed to have been set off in accordance with the provisions of the Plan. For the avoidance of doubt: (aa) any Claim that is withdrawn will not be an Allowed Claim; (bb) any proof of claim filed after the Bar Date will not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim; (cc) except as otherwise specified in the Plan or any Final Order, and except for any Allowed Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim will not include interest on such Claim from and after the Petition Date; and (dd) the Debtor or Wind-Down Debtor may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law. "Allow" and "Allowing" have correlative meanings.

10.     "Ballot" means the form of ballot approved by the Bankruptcy Court and distributed to Holders of Claims entitled to vote on this Plan on which is to be indicated an acceptance or rejection of this Plan and the election described in Section 5.10 hereof.

11.     "Bankruptcy Code" means title 11 of the United States Code, as now in effect or hereafter amended.

12.     "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

3

13.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the Local Rules.

14.    "Bar Date" means, with respect to any particular Claim, the specific date set forth in the Bar Date Order or in this Plan as the last day for filing a proof of claim or a request for allowance of an Administrative Claim or a proof of interest against the Debtor in this Chapter 11 Case for that specific Claim.

15.    "Bar Date Order" means the order of the Bankruptcy Court entered on February 17, 2026 [D.I. 122].

16.    "Bidding Procedures Motion" means the motion filed by the Debtor on January 21, 2026 [D.I. 18].

17.    "Bidding Procedures Supplement" has the meaning given to it in Section 4.3(f).

18.    "Bidding Procedures Order" means the order of the Bankruptcy Court entered on February 10, 2026 [D.I. 80].

19.    "BLM" means the United States Bureau of Land Management.

20.    "Business Day" means any day, other than a Saturday, Sunday, or a legal holiday (as used in Bankruptcy Rule 9006(a)).

21.    "Cash" means legal tender of the United States of America or its equivalents, including but not limited to bank deposits, checks, and other similar items.

22.    "Causes of Action" means any and all actions, suits, claims for relief, causes of action, Chapter 5 Causes of Action, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise, whether arising prior to or after the Petition Date.  Causes of Action include, but are not limited to, those Causes of Action listed on a schedule to be filed with the Plan Supplement, which exhibit may be modified up through and including the Effective Date, subject to the terms of Section 12.2 hereof.  For the avoidance of doubt, Causes of Action does not include any claims or causes of action transferred to the Purchaser pursuant to the Purchase Agreement(s), if any.

23.    "Chapter 5 Causes of Action" means any and all actual or potential claims and causes of action arising under Chapter 5 of the Bankruptcy Code, including claims, rights, and causes of action arising under sections 510, 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code, including but not limited to, the recovery of preferences and fraudulent transfers from any Entity that received cash or any other interest in property from the Debtor.  For the avoidance of doubt, Chapter 5 Causes of Action does not include any claims or causes of action transferred to the Purchaser pursuant to the Purchase Agreement(s), if any.

4

24.     "Chapter 11 Case" means this Chapter 11 Case commenced by the Debtor in the Bankruptcy Court.

25.     "Claim" means a claim, as such term is defined in Bankruptcy Code section 101(5), against the Debtor.

26.     "Claims Agent" means the Debtor's claims, noticing and solicitation agent, Epiq Corporate Restructuring, LLC, in its capacity as noticing, claims, and solicitation agent for the Debtor, pursuant to an order of the Bankruptcy Court.

27.     "Class" means a group of Claims or Interests described in Article III of this Plan.

1.26     "Closing Date" means the date upon which the Debtor and any Purchaser consummate the Sale Transaction.

28.     "CMB" means, collectively, CMB Export LLC, CMB Infrastructure Group IX, LP, and CMB Infrastructure Group XI, LP.

29.     "CMB Arbitration Claim" means any and all Claims of CMB that are, could be, or could have been asserted by CMB against the Debtor in the ICC Arbitrations.

30.     "CMB Claim" means any and all Claims of CMB against the Debtor, including the CMB Arbitration Claim, the CMB Qui Tam Claim, the CMB Litigation Claim, the CMB Secured Claim, any Claims asserted or purportedly asserted in the CMB Proofs of Claim, and any other Claim that is, could be, or could have been asserted by CMB against the Debtor.

31.     "CMB Letter of Credit" means that certain letter of credit in the aggregate Face Amount of $6 million issued in favor of CMB Export, LLC, as beneficiary, in its capacity as agent for each of CMB Export, LLC, CMB Infrastructure Investment Group IX, LP, and Solar Reserve CSP Holdings, LLC, as further described in section 7.14 of the 2020 Plan.

32.     "CMB Litigation" means the District Court Action.

33.     "CMB Litigation Claim" means any and all Claims of CMB that are, could be, or could have been asserted by CMB against the Debtor in the District Court Action.

34.     "CMB Proofs of Claim" means any and all Proofs of Claim filed by CMB, including Proofs of Claim designated 10000, 10001, and 10002 on the claims register, and any amendments to those Claims.

35.     "CMB Qui Tam Claim" means any and all qui tam Claims asserted by CMB, as relator, including in the Qui Tam Action.  For the avoidance of doubt, the CMB Qui Tam Claim includes any Claims and Causes of Action asserted or brought by CMB on behalf of the United States.

36.     "CMB Secured Claim" means the CMB Arbitration Claim and the CMB Litigation Claim, to the extent secured by the CMB Letter of Credit.  For avoidance of doubt, the

5

CMB Qui Tam Claim and any other Claims purportedly asserted in the CMB Proofs of Claim other than the CMB Litigation Claim and the CMB Arbitration Claim are not part of the CMB Secured Claim.

37.     "Combined Disclosure Statement and Plan" means this combined disclosure statement and chapter 11 plan, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

38.     "Company" means the Debtor before the Petition Date.

39.     "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case.

40.     "Confirmation Hearing" means the first hearing held by the Bankruptcy Court to consider confirmation of the Plan.

41.     "Confirmation Order" means an order of the Bankruptcy Court confirming this Plan pursuant to, among others, section 1129 of the Bankruptcy Code.

42.     "Debtor" means Tonopah Solar Energy, LLC.

43.     "DIP Claims" means any Claim against the Debtor derived from, based upon, or arising under the DIP Facility, and includes all DIP Obligations (as defined in the DIP Term Sheet).

44.     "DIP Facility" means that certain senior secured, first-lien and super-priority and priming debtor-in-possession delayed draw term loan facility in the aggregate principal amount of up to $10 million provided in accordance with the DIP Loan Documents.

45.     "DIP Lender" means Crescent Dunes Finance, Inc., in its capacity as DIP Lender under the DIP Facility.

46.     "DIP Loan Documents" means, collectively, that the DIP Term Sheet, the DIP Orders, and any other legal documentation as may be required by the DIP Lender to be delivered in connection with the DIP Term Sheet and DIP Orders, as such documents may be amended, supplemented, or otherwise modified from time to time in accordance with their terms.

47.     "DIP Orders" means, collectively, the Interim DIP Order and the Final DIP Order.

48.     "DIP Term Sheet" means that certain Senior Secured Superpriority DIP Term Sheet dated as of December 16, 2025 by and among Tonopah Solar Energy, LLC and Crescent Dunes Finance, Inc.

49.     "Disallowed" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim that has been disallowed under the Combined Disclosure Statement and Plan, the Bankruptcy Code, applicable law or by a Final Order.

6

50. "Disclosure Statement" means the disclosure statement, as amended, supplemented or modified from time to time, that is embodied within this Combined Disclosure Statement and Plan and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, Local Rules 3017-1 and 3017-2, and other applicable law.

51. "Disputed" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

52. "Distribution" means the distribution of Cash and other non-Cash consideration, including mutual releases, as the case may be, in accordance with the Plan.

53. "Distribution Address" means the address set forth in (a) the Proof of Claim filed by the Holder, (b) any written notice of address change delivered to the Debtor after the date of filing of any related Proof of Claim, (c) the Schedules, if no Proof of Claim has been filed and the Debtor has not received a written notice of a change of address, (d) the other records of the Debtor at the time of the Distribution if no Proof of Claim has been filed, the Debtor has not received a written notice of a change of address, and the Schedules do not include an address, or (e) any change of address as reflected on the Bankruptcy Court docket.

54. "Distribution Date" means the date determined by the Plan Administrator when Distributions are to be made under the Plan.

55. "Distribution Record Date" means the record date for purposes of making Distributions under this Plan on account of Allowed Claims, which date will be the first day of the Confirmation Hearing, or such other date as is designated in a Final Order of the Bankruptcy Court.

56. "District Court Action" means the litigation pending before the United States District of Nevada, captioned *CMB Infrastructure Group IX, LP et al. v. Cobra Energy Investment Finance, Inc. et al.*, Case No. 2:21-cv-00214-CDS-DJA.

57. "Effective Date" means the first date on which all of the conditions to effectiveness of the Plan have been satisfied or have been waived in writing and the Debtor declares the Plan effective. For the avoidance of doubt, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

58. "Entity" has the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

59. "EPC Contract" has the meaning ascribed to it in Section 4.1(a).

60. "Estate" means the estate of the Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case on the Petition Date and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through the Effective Date.

61. "Estimation Order" means an order or orders of the Bankruptcy Court estimating for voting and/or Distribution purposes (under section 502(c) of the Bankruptcy Code)

the amount of any Claim, or the aggregate (and if applicable, individual) Face Amount of Disputed Claims in each relevant Class. The defined term Estimation Order includes the Confirmation Order if the Confirmation Order grants the same relief that would have been granted in a separate Estimation Order.

62. "Exculpated Parties" means, each in their respective capacities as such, (a) the Debtor; and (b) the Related Parties of the Debtor to the extent such Person or Entity is a fiduciary of the Estate (including, without limitation, each of its current and former officers and managers (provided, that a former officer and/or manager will only be an Exculpated Party if such officer or manager served in such capacity as of the Petition Date), principals, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and all other retained Professionals, of the Debtor or the Plan Administrator).

63. "Executory Contract or Lease" means a contract or lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

64. "Face Amount" means (a) with respect to any Claim for which a Proof of Claim is filed, an amount equal to: (i) the liquidated amount, if any, set forth in such Proof of Claim, or (ii) any other amount set forth in an Estimation Order; or (b) with respect to any Claim scheduled in the relevant Debtor's Schedules, but for which no Proof of Claim is timely filed, the amount of the Claim scheduled as undisputed, noncontingent, and liquidated.

65. "Final DIP Order" means the means the order of the Bankruptcy Court entered on February 13, 2026 [D.I. 110].

66. "Final Order" means an order or judgment of the Bankruptcy Court, as entered on the docket of the Bankruptcy Court, that has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, seek review, rehearing, or to file a petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand, or certiorari is pending, or (b) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, however, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or other rules governing procedure in cases before the Bankruptcy Court, may be filed with respect to such order will not cause such order not to be a Final Order.

67. "Former Manager Claim" means any Claim asserted by a Former Manager, including any Claim asserted in the Former Manager Proofs of Claim and any Claim for indemnification obligations as established in section 10.7 of the 2020 Plan asserted by a Former Manager.

68. "Former Manager Proofs of Claim" means any and all Proofs of Claim filed by a Former Manager, including Proofs of Claim designated 3, 4, 5, 6 (filed by Stone Phillips LLC), and 7 (filed by Asgaard Capital LLC) on the claims register, and any amendments to those Claims.

69. "Former Manager Settlement" means the settlement reflected in the treatment of Class 5 Claims in Article III of this Plan and attached as **Exhibit B**, incorporated by reference.

70. "Former Managers" means, collectively, Joseph A. Bondi, Anna Phillips, and Charles C. Reardon.

71. "General Bar Date" has the meaning given to it in the Bar Date Order.

72. "General Unsecured Claim" means a Claim that is not (a) an Administrative Claim, (b) a Priority Tax Claim, (c) an Other Priority Claim, (d) a CMB Secured Claim; (e) a Prepetition Lender Claim; (f) a Former Manager Claim; (g) a General Unsecured Convenience Class Claim; or (h) an Interest.

73. "General Unsecured Convenience Class Claim" means a General Unsecured Claim Allowed at or voluntarily reduced to an amount of $10,000 or less.

74. "General Unsecured Convenience Class Claim Fund" means $7,500 for distribution to holders of all Allowed General Unsecured Claims and Allowed General Unsecured Convenience Class Claims under Article III, which will be funded from Proceeds of the Sale Transaction, and if such proceeds are insufficient, then from proceeds of the DIP Facility.

75. "General Unsecured Rejection Damages Claim" means a General Unsecured Claim arising out of rejection of an Executory Contract or Lease under section 365(a) of the Bankruptcy Code, and will be treated as a Class 6 General Unsecured Claim.

76. "Governmental Unit" has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

77. "Governmental Bar Date" has the meaning ascribed to it in the Bar Date Order.

78. "Holder" or "Holders" means a Person or an Entity holding a Claim or Interest.

79. "ICC Arbitrations" means the arbitrations pending before the ICC Tribunal constituted under the Rules of Arbitration of the International Court of Arbitration of the International Chamber of Commerce, each captioned *CMB Infrastructure Group IX, LP et al. v. Cobra Energy Investment Finance, Inc. et al.*, Case Nos. 26862/PDP and 29683/ICA4.

80. "ICC Tribunal" means the arbitral tribunal of the ICC Arbitrations.

81. "Impaired" means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

82. "Impaired Class" means a Class of Claims or Interests that is Impaired.

9

83.   "Indemnification Escrow Account" means the Indemnification Escrow Account established under the 2020 Plan and the Indemnification Escrow Agreement.

84.   "Indemnification Escrow Agreement" means that certain Escrow Agreement dated as of December 23, 2020 by and among TSE, the Former Managers, Mark Manski, and Citibank, N.A., as escrow agent.

85.   "Indemnified Persons" means the Plan Administrator, and the Plan Administrator's professionals, employees, officers, directors, agents, Representatives, and Professionals, if any.

86.   "Insider" has the meaning ascribed to such term in section 101(31) of the Bankruptcy Code.

87.   "Interest" means an equity security, within the meaning of section 101(16) of the Bankruptcy Code in the Debtor.

88.   "Interim DIP Order" means the order of the Bankruptcy Court entered on January 23, 2026 [D.I. 49].

89.   "Interim Approval and Procedures Order" means the order of the Bankruptcy Court entered on May 13, 2026 [D.I. 287].

90.   "Investigation" has the meaning ascribed to it in Section 4.1(a).

91.   "Joint Release Instruction" has the meaning given to it in the Indemnification Escrow Agreement.

92.   "Lien" means: (a) a judicial lien as defined in section 101(36) of the Bankruptcy Code; (b) a lien as defined in section 101(37) of the Bankruptcy Code; (c) a security interest as defined in section 101(51) of the Bankruptcy Code; (d) a statutory lien as defined in section 101(53) of the Bankruptcy Code; and (e) any other lien, interest, charge, or encumbrance.

93.   "Loan" has the meaning given to it in Section 4.2.

94.   "Local Rules" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware as now in effect or hereafter amended.

95.   "Manski Settlement" means that certain settlement agreement with Mark Manski, attached as Exhibit 1 to the *Order Approving and Authorizing the Settlement Agreement By and Between the Debtor and Former Manager*.

96.   "Net Residual Asset Proceeds" means the proceeds of any Residual Assets, less any customary transaction fees and expenses; *provided*, *however*, that Net Residual Asset Proceeds will not include the Cash necessary to establish Reserves or make Distributions to Holders of Allowed Administrative Claims, Allowed Priority Claims, or Allowed Other Priority Claims in accordance with the terms of this Plan and the DIP Orders.

10

97.     "Net Sale Proceeds" means the proceeds of a Sale Transaction, less (a) any customary transaction fees and expenses, such as (i) any and all amounts owed to SSG arising from the Sale Transaction and (ii) any approved break-up fees and expense reimbursements, and (b) funding of (i) the General Unsecured Convenience Class Claim Fund, (ii) the Wind-Down Funds, and (iii) an amount sufficient to pay in full all Allowed Administrative Claims and Professional Fee Claims.

98.     "Objection" means any objection, application, motion, complaint, or any other legal action seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, establish the priority of, expunge, subordinate, or estimate any Claim (including any objection or opposition to any request for allowance or payment of any Administrative Claim).

99.     "Other Priority Claim" means any Claim entitled to priority under sections 503(b) or 507(a)(2) of the Bankruptcy Code that is not a Priority Tax Claim.

100.    "Other Secured Claim" means any Secured Claim, including a Secured Tax Claim, other than the Prepetition Lender Claim or the CMB Secured Claim.

101.    "Person" means any individual, corporation, partnership, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit, or any political subdivision thereof, Holders of Interests, Holders of Claims, current or former employees of the Debtor, or any other Entity.

102.    "Petition Date" means January 21, 2026, the date on which the Debtor commenced its Chapter 11 Case in the Bankruptcy Court.

103.    "Plan" means this plan under chapter 11 of the Bankruptcy Code, together with any amendments or modifications hereto as the Debtor may file hereafter in accordance with the terms of this Plan.

104.    "Plan Administrator" means the Person to have all powers and authorities set forth in Section 7.7 hereof.

105.    "Plan Documents" means the documents, including this Combined Disclosure Statement and Plan, to be executed, delivered, assumed, and/or performed in connection with the consummation of this Plan, including, without limitation, the documents to be included in the Plan Supplement, and any and all exhibits to the Plan and the Disclosure Statement.

106.    "Plan Supplement" means the supplemental appendix to this Plan, filed with the Bankruptcy Court not less than seven (7) calendar days prior to the Voting Deadline, which contains, among other things, draft forms or signed copies, as the case may be, of the schedule of Retained Actions, the Wind-Down Budget, the identity of the Plan Administrator, and any other schedules, lists, or documents that supplement or clarify aspects of this Plan and are identified as part of the Plan Supplement.

107.    "Post Effective Date Reserve" means any reserve established by the Plan Administrator in accordance with Section 7.7 hereof and funded from Cash available in the Estate on the Effective Date, which Cash will include the Wind-Down Amount.

11

108.    "Prepetition Equity Pledge Agreement" means that certain Equity Pledge Agreement, dated as of December 18, 2020, between CDI, LLC, as pledgor, and the Prepetition Lender, as secured party.

109.    "Prepetition Lender" means Crescent Dunes Finance, Inc., in its capacity as lender under the Prepetition Loan Agreement.

110.    "Prepetition Lender Claim" means any and all Claims of the Prepetition Lender arising out of the Prepetition Loan Agreement, including the Line of Credit Loan (as defined in the Prepetition Loan Agreement, as may be amended, amended and restated, supplemented or otherwise modified from time to time).  For the avoidance of doubt, the Prepetition Lender Claim includes contingent, unliquidated indemnification obligations.

111.    "Prepetition Loan Agreement" means that certain Loan Agreement, dated as of December 18, 2020, between Tonopah Solar Energy, LLC, as borrower, and Crescent Dunes Finance, Inc., as lender (as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with its provisions).

112.    "Prepetition Security Agreement" means that certain Security Agreement, dated as of December 18, 2020, between Tonopah Solar Energy, LLC, as borrower, and Crescent Dunes Finance, Inc., as secured party.

113.    "Priority Tax Claim" means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

114.    "Professional" means any professional Person or Entity employed in this Chapter 11 Case under Bankruptcy Code sections 327, 328, 363, or 1103 or otherwise.

115.    "Professional Fee Claim" means a Claim for compensation or reimbursement of expenses of a Professional pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code in connection with the Chapter 11 Case.

116.    "Professional Fee Claims Estimate" means (i) with respect to each Professional, the Professional's good faith estimate of the amount of such Professional's accrued unpaid Professional Fee Claims through the Effective Date, to be provided by each Professional in writing to the Debtor, not less than five (5) days prior to the Effective Date, and (ii) with respect to all of the Professionals, collectively, the sum of all individual Professional Fee Claims Estimates.

117.    "Professional Fee Escrow Account" means an escrow account to hold an amount of Cash equal to the Professional Fee Claims Estimate funded by the Debtor as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date solely for the purpose of paying all remaining Allowed Professional Fee Claims.  For the avoidance of doubt, the Professional Fee Escrow Account may be that certain escrow account established and funded pursuant to the DIP Orders for the purpose of paying Bankruptcy Court-approved professional fees.

118.    "Proof of Claim" means a proof of Claim filed against the Debtor in the Chapter 11 Case.

119.    "Purchase Agreement" means each of, or collectively, as applicable, the asset purchase agreement(s), as may be amended, supplemented, restated, or otherwise modified from time to time by and between any Purchaser, as buyer, and the Debtor, as seller, for the transfer of any acquired assets pursuant to one or more Sale Transactions in the Chapter 11 Case, in each case to the extent approved by an Order of the Bankruptcy Court.

120.    "Purchaser" means each of and collectively, as applicable, the party or parties who, pursuant to one or more Purchase Agreements and Sale Orders, purchases any of the acquired assets and takes assignment of any of the assumed liabilities and assumed contracts under the applicable Purchase Agreement.

121.    "Qui Tam Action" has the meaning ascribed to it in Section 4.1(d) hereof.

122.    "Rejection Damages Bar Date" has the meaning ascribed to it in the Bar Date Order.

123.    "Related Parties" means, with respect to any Person or Entity, such Person's or Entity's current and former directors, managers, officers (provided, that a former director, manager, and/or officer will only be a Related Party if such director, manager, or officer served in such capacity as of the Petition Date), limited partners, general partners, equity holders, stockholders, shareholders, members, affiliates, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and any other professionals serving such Person or Entity, provided that Related Parties shall not include any Person or Entity included in a more specific definition.

124.    "Released Claims" means any and all claims or causes of action, against the Released Parties, relating to any pre- or post-Petition Date acts or omissions, whether known or unknown, pertaining to the business activities and operations of the Debtor, the debts, liabilities, obligations and assets of the Debtor, the ownership, management, direction, or control of the Debtor, the Wind-Down, the Sale Transactions, the Plan, or any transactions or communications among the Released Parties with respect to any of the foregoing.

125.    "Released Parties" means collectively, and in each case in its capacity as such:  (a) the Debtor; (b) the Wind-Down Debtor; (c) the Prepetition Lender; (d) the DIP Lender; (e) ACSIA; (f) each Former Manager; (g) each Releasing Party; (h) with respect to each of the foregoing Entities in clauses (a) through (g), the Related Parties of such Entities; and (i) each Holder of a Claim or Interest that (i) elects on its ballot or opt-in form to grant the voluntary release contained in Section 8.3 hereof by checking the opt-in box on the ballot or opt-in form, and returning it in accordance with the instructions set forth on the applicable form, indicating that they elect to grant the releases provided in the Plan and (ii) does not object to confirmation of the Plan; provided, however, that notwithstanding the foregoing, no Released Party shall receive a release from any Retained Actions expressly identified in the schedule of Retained Actions.  For the avoidance of doubt, CMB is not a Released Party.

13

126.    "Releasing Parties" means collectively, and in each in case in its capacity as such:  (a) the Debtor; (b) the Prepetition Lender; (c) the DIP Lender; (d) each Former Manager; (e) each Holder of a Claim or Interest that elects on its ballot or opt-in form to grant the voluntary release contained in Section 8.3 hereof by checking the opt-in box on the ballot or opt-in form, and returning it in accordance with the instructions set forth on the applicable form, indicating that they elect to grant the releases provided in the Plan; and (f) the Related Parties of the foregoing but only to the extent such Related Party would be obligated to release under principles of agency if it were so directed by the applicable Person or Entity in clauses (a) through (e).  For the avoidance of doubt, CMB is not a Releasing Party.

127.    "Reserves" means, collectively, the Professional Fee Escrow Account and any other Reserve established by the Wind-Down Debtor.

128.    "Residual Assets" mean all property of the Estate that has not been sold, transferred, assigned, or disposed of as of the Effective Date (including after giving effect to any Sale Transactions, if any), including any residual interest of the Debtor in the Indemnification Escrow Account (including any TSE Funds), the CMB Letter of Credit, the General Unsecured Convenience Class Claim Fund (after all applicable distributions are made); and the Reserves (after all applicable beneficiaries are paid in full); *provided*, *however*, that Residual Assets will not include the Cash necessary to establish Reserves or make Distributions to Holders of Allowed Administrative Claims, Allowed Priority Claims, or Allowed Other Priority Claims in accordance with the terms of this Plan and the DIP Orders.

129.    "Retained Actions" means the Causes of Action of the Debtor that are not released, waived, or transferred pursuant to the Plan, a schedule of which may be set forth in the Plan Supplement, as may be amended, modified, or supplemented from time to time; provided, that, for the avoidance of doubt, Retained Actions do not include any Causes of Action that are or were settled, released, waived, exculpated, or transferred (a) prior to the Petition Date by the Debtor, or (b) pursuant to the Plan, the Purchase Agreement(s), if any, or any Order of the Bankruptcy Court entered in this Chapter 11 Case, as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time.

130.    "RSA" means that *Restructuring Support Agreement* dated as of December 16, 2025 by and between the Debtor, the Prepetition Lender, Crescent Dunes Investment, LLC, and ACSIA.

131.    "Sale Transaction" means, collectively, those certain transactions between the Debtor and the Purchaser(s) in connection with the Purchase Agreement(s) and/or the Sale Order(s).

132.    "Sale Order" means each of, or collectively, as applicable, the order(s) of the Bankruptcy Court, approving a Sale Transaction [D.I. 184], as may be amended, supplemented, or otherwise modified from time to time.

133.    "Schedules" means the schedules of assets and liabilities, schedules of Executory Contracts or Leases, and statements of financial affairs filed by the Debtor pursuant to

14

section 521 of the Bankruptcy Code [D.I. 75], as may have been amended, modified, or supplemented from time to time.

134.    "Secured" means when referring to a Claim:  (a) secured by a Lien on which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined by section 506(a) of the Bankruptcy Code, or (b) Allowed pursuant to this Plan as a Secured Claim (subject to the Confirmation Order becoming a Final Order).

135.    "Secured Tax Claim" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under Bankruptcy Code section 507(a)(8) (determined irrespective of time limitations), including any related Secured Claim for penalties.

136.    "SSG" means SSG Advisors, LLC, as investment banker to the Debtor.

137.    "Stalking Horse APA" means that certain asset purchase agreement for all or substantially all of the Debtor's assets, which was filed as "Exhibit 1" to the Bidding Procedures Supplement [D.I. 131], and as may be further amended, supplemented, or otherwise modified from time to time.

138.    "TSE" means the Company or the Debtor, as applicable.

139.    "TSE Funds" means the balance of the Indemnification Escrow Distribution after giving effect and distribution of the FM Funds (as defined in the Former Manager Settlement).

140.    "Undeliverable Distributions" means any Cash or other distributable property unclaimed on or after the Effective Date or the date on which an additional Distribution would have been made in respect of an Allowed Claim.  Unclaimed Distributions include (a) checks (and the funds represented thereby) mailed to a Distribution Address and returned as undeliverable without a proper forwarding address, (b) funds for checks that have not been cashed within ninety (90) days after the mailing of the Distribution upon which time the Plan Administrator may issue a stop payment, (c) checks (and the funds represented thereby) not mailed or delivered because no Distribution Address to mail or deliver such property was available, and (d) any Distribution deemed to be an Unclaimed Distribution pursuant to Section 10.5 hereof.

141.    "Unimpaired" means, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

142.    "U.S. Trustee" means the Office of the United States Trustee for Region 3.

143.    "U.S. Trustee Fees" has the meaning ascribed to it in Section 2.1 hereof.

144.    "Voting Deadline" means June 15, 2026 at 4:00 p.m. (Pacific Time), the date specified in the Disclosure Statement, the Ballots, the Interim Approval and Procedures Order, and/or any related solicitation documents approved by the Bankruptcy Court through the Interim

15

Approval and Procedures Order as the last date for Holders of Claims entitled to vote on this Plan to submit their Ballots with respect to this Plan, as such date may be extended by the Debtor.

145.    "Wind-Down" means the wind-down and dissolution of the Debtor and final administration of the Estate following the Effective Date as set forth in Article VII of the Plan.

146.    "Wind-Down Budget" means that certain budget governing the fees, expenses, and disbursements required for the Wind-Down, subject to the consent of the DIP Lender and the Prepetition Lender.

147.    "Wind-Down Debtor" means the Debtor; *provided*, *that* if the Plan Administrator elects to establish a trust under Section 7.8, references to Wind-Down Debtor will be inclusive of such trust.

148.    "Wind-Down Funds" means Cash in an amount consistent with the Wind-Down Budget of an amount sufficient to effectuate the Wind-Down.

1.2    **Rules of Interpretation**

Unless otherwise specified, all section or exhibit references in this Combined Disclosure Statement and Plan are to the respective section in, or exhibit to, this document. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this document as a whole and not to any particular section, subsection, or clause contained therein, unless the context requires otherwise. The words "include" and "including" mean "include, without limitation," or "including," as the case may be. Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural.

Any reference in this Combined Disclosure Statement and Plan to a contract, instrument, release, indenture, or other agreement or documents being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions, and any reference in this Combined Disclosure Statement and Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, amended and restated, supplemented or otherwise modified. Subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, release, or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan will be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.

The captions and headings in this Combined Disclosure Statement and Plan are for convenience of reference only and do not limit or otherwise affect the provisions hereof. Any reference to any Entity as a holder of a Claim or Interest includes that Entity's successors and assigns.

1.3     **Rules of Construction**.

(a)     **Undefined Terms**.  Any term used in this Combined Disclosure Statement and Plan that is not otherwise defined in this document has the meaning ascribed to any such term in the Bankruptcy Code and/or the Bankruptcy Rules.

(b)     **Reference to the Debtor or the Wind-Down Debtor.**  Except as otherwise specifically provided to the contrary, references in this Combined Disclosure Statement and Plan to the Debtor or the Wind-Down Debtor mean the Debtor and the Wind-Down Debtor, as applicable, to the extent the context requires.

(c)     **Miscellaneous Rules**.  This Combined Disclosure Statement and Plan is subject to the following miscellaneous rules:  (i) the rules of construction set forth in section 102 of the Bankruptcy Code apply, unless superseded in this document or in the Confirmation Order; (ii) any reference in this Combined Disclosure Statement and Plan to an existing document or Exhibit means such document or Exhibit as it may have been amended, amended and restated, supplemented, or otherwise modified as of the Effective Date; (iii) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) apply; (iv) whenever this Combined Disclosure Statement and Plan provides that a payment or Distribution will occur "on" any date, it means "on, or as soon as reasonably practicable after," such date; and (v) references in this Combined Disclosure Statement and Plan and other Plan Documents to "Section" or "Article" are interchangeable.

(d)     **Appendices and Plan Documents**.  All Plan Documents and appendices to the Plan are incorporated into the Combined Disclosure Statement and Plan by reference and are a part of the Combined Disclosure Statement and Plan as if set forth in full in this document.  The documents contained in the exhibits and Plan Supplement will be approved by the Bankruptcy Court pursuant to the Confirmation Order.  Holders of Claims and Interests may inspect a copy of the Plan Documents, once filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or free of charge at https://dm.epiq11.com/case/tonopahsolar/info.

## ARTICLE II
## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, DIP Claims, and Professional Fee Claims are not classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III in this Combined Disclosure Statement and Plan.

2.1     **Administrative Claims, Priority Tax Claims, and U.S. Trustee Fees**.

Except with respect to Administrative Claims that are (a) Professional Fee Claims, (b) Claims for U.S. Trustee Fees, or (c) governmental Claims that are subject to section 503(b)(1)(D) of the Bankruptcy Code, Holders of Administrative Claims must file with the Claims Agent and serve on the Wind-Down Debtor requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, so as to be actually received on or before the Administrative Claim Bar Date.

17

To the extent not already paid or assumed by a Purchaser as of the Effective Date and unless otherwise agreed to by the Holder of an Allowed Administrative Claim or Allowed Priority Tax Claim, each Holder of an Allowed Administrative Claim or Allowed Priority Tax Claim will receive payment in full, as soon as practicable after (i) the Effective Date but in no event later than 30 days after the Administrative Claim Bar Date, or (ii) the date such Administrative Claim or Priority Tax Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court, to be paid in cash or pursuant to such other treatment as may be agreed upon by the Holder of such Claim and the Debtor or the Wind-Down Debtor, as applicable.

Any Person or Entity who is required to timely file an Administrative Claim or Priority Tax Claim but fails to do so will not be treated as a creditor with respect to such Claim for the purpose of Distribution in this Chapter 11 Case on account of such Claim. The notice of the Effective Date of the Plan that will be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f) will set forth the Administrative Claim Bar Date and will constitute notice of such Administrative Claim Bar Date.

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code and any interest thereon pursuant to 31 U.S.C. § 3717 (together, the "U.S. Trustee Fees") prior to the Effective Date will be paid by the Debtor in full in Cash on the Effective Date. After the Effective Date, the Wind-Down Debtor will be liable to pay and shall pay any and all U.S. Trustee Fees in full in Cash when due and payable. The Debtor will file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due. Within two (2) business days after the Effective Date or as soon thereafter as practical, the Wind-Down Debtor will file a Notice of Occurrence of the Effective Date, identifying the Effective Date and indicating that it has occurred. After the Effective Date, the Wind-Down Debtor will file with the Bankruptcy Court all quarterly post-confirmation reports when they become due. The Wind-Down Debtor will remain obligated to pay U.S. Trustee Fees until the earliest of when the Chapter 11 Case is closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. The U.S. Trustee Fees are allowed. The U.S. Trustee will not be required to file any Administrative Claim in the case and will not be treated as providing any release under the Plan. Nothing in the Plan Documents (including the Plan Supplement) shall modify, change, or in any way prejudice the U.S. Trustee's rights under 28 U.S.C. § 1930 (which rights are fully reserved and preserved).

2.2 **DIP Claims**.

All DIP Claims will be deemed Allowed as of the Effective Date in an amount equal to (1) the principal amount outstanding under the DIP Facility on such date, (2) all interest accrued and unpaid thereon to the date of payment, and (3) all accrued and unpaid fees, expenses, and noncontingent indemnification obligations payable under the DIP Loan Documents and the DIP Orders.

Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, the DIP Lender (or one or more of its designees) will receive, after funding of the General Unsecured Convenience Class Claim Fund, the Wind-Down Funds, and the Professional Fee Escrow: all Net Sale Proceeds and all Net Residual Asset Proceeds until the

18

Allowed DIP Claim has been paid in full; provided that the DIP Lender will not receive more than payment in full on account of the Allowed DIP Claim.

Provided that all DIP Claims are paid in full as provided in this Section 2.2, on the Effective Date, the DIP Facility and all DIP Loan Documents will be deemed cancelled, all Liens on property of the Debtor and the Wind-Down Debtor arising out of or related to the DIP Facility will automatically terminate, and all collateral subject to such Liens will be automatically released, in each case without further action by the DIP Lender and all DIP Claims will be automatically discharged and released, in each case without further action by the DIP Lender. The DIP Lender will take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtor or the Wind-Down Debtor, as applicable, and the Debtor or Wind-Down Debtor, as applicable is permitted to file any applicable releases or terminations.

2.3    **Professional Fee Claims**.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed and served within forty-five (45) days after the Effective Date. The Bankruptcy Court will determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders.

The Professional Fee Escrow Account will be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No liens, claims, or interests will encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account, except that any amounts remaining in the Professional Fee Escrow Account after payment of allowed fees and expenses will be collateral of the DIP Lender. Funds held in the Professional Fee Escrow Account will not be considered property of the Estate or the Debtor or Wind-Down Debtor.

Allowed Professional Fee Claims will be paid from the Professional Fee Escrow Account or Cash in the other Reserves, as applicable, as and when such Claims are Allowed or otherwise approved for payment by entry of an order of the Bankruptcy Court. When all Allowed Professional Fee Claims have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account will promptly be transferred to the Wind-Down Debtor for all purposes hereunder and will be collateral of the DIP Lender (to the extent the DIP Facility remains outstanding and any Allowed DIP Claim remains unpaid).

From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Wind-Down Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

19

## ARTICLE III
## CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE
ESTIMATES ONLY AND ARE, THEREFORE, SUBJECT TO CHANGE.**

3.1     **General Rules of Classification**.

The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the claims reconciliation process. Actual recoveries may vary widely within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided in this document and/or the actual Distribution received by Creditors. The projected recoveries are based on information available to the Debtor as of the date hereof and reflect the Debtor's estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere in the Combined Disclosure Statement and Plan, the Debtor makes no representation as to the accuracy of these recovery estimates. The Debtor expressly disclaims any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

Except as otherwise explicitly provided in the Plan, nothing affects the Debtor's rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

| Class | Status / Voting | Projected Amount of Claims / Interests | Projected Recovery |
|---|---|---|---|
| **Class 1**<br>Other Secured Claims | Unimpaired<br><br>Not entitled to vote<br><br>Deemed to accept Plan | $0 | N/A |
| **Class 2**<br>Other Priority Claims | Unimpaired<br><br>Not entitled to vote<br><br>Deemed to accept Plan | $0 | N/A |
| **Class 3**<br>Prepetition Lender Claim | Impaired<br><br>Entitled to vote | $184,334,271 | Undetermined |
| **Class 4**<br>CMB Secured Claims | Unimpaired<br><br>Not entitled to vote | $0 | N/A |

20

| Class | Status / Voting | Projected Amount of Claims / Interests | Projected Recovery |
|---|---|---|---|
| | Deemed to accept Plan | | |
| **Class 5** <br> Former Manager Claims | Impaired <br> Entitled to vote | $1,875,000 | Other |
| **Class 6** <br> General Unsecured Claims | Impaired <br> Deemed to reject <br> Not entitled to vote | $0 | N/A |
| **Class 7** <br> General Unsecured Convenience Class Claims | Impaired <br> Entitled to vote | $9,012.33 | 83.2% |
| **Class 8** <br> TSE Interests | Impaired <br> Deemed to reject <br> Not entitled to vote | N/A | N/A |

**Class 1**: **Other Secured Claims**

 (a) **Classification, Impairment, and Voting**

Class 1 consists of Other Secured Claims against the Debtor. Allowed Class 1 Claims are Unimpaired by the Plan and are therefore deemed to accept the Plan and not entitled to vote on the Plan.

 (b) **Treatment**

Except to the extent that a Holder of an Allowed Other Secured Claim and the Debtor or the Wind-Down Debtor, as applicable, agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release, and in exchange for such Allowed Other Secured Claim, each such Holder will receive at the Debtor's or the Wind-Down Debtor's discretion:

  (i) payment in full in Cash of the unpaid portion of such Holder's Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, payment will be made in accordance with its terms in the ordinary course);

  (ii) the Debtor's interest in the collateral securing such Holder's Allowed Other Secured Claim; or

21

(iii)    such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired in accordance with section 1124(1) or (2) of the Bankruptcy Code.

**Class 2**: **Other Priority Claims**

(a)      **Classification, Impairment, and Voting**

Class 2 consists of Other Priority Claims against the Debtor.  Allowed Class 2 Claims are Unimpaired by the Plan and are therefore deemed to accept the Plan and not entitled to vote on the Plan.

(b)      **Treatment**

Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor or the Wind-Down Debtor, as applicable, agree to a less favorable or different treatment, on, or as soon as reasonably practicable after, the later of the Effective Date, the date such Other Priority Claim becomes an Allowed Other Priority Claim, or such other date(s) permitted under section 1129(a)(9) of the Bankruptcy Code, each Holder of an Allowed Other Priority Claim will receive (i) one or more Distributions in Cash in an aggregate amount equal to such Allowed Other Priority Claim or (ii) such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired in accordance with section 1124(1) or (2) of the Bankruptcy Code.

**Class 3: Prepetition Lender Claim**

(a)      **Classification, Impairment, and Voting**

Class 3 consists of the Prepetition Lender Claim against the Debtor.  The Class 3 Claim is Impaired by the Plan and is entitled to vote on the Plan.

(b)      **Allowance of the Prepetition Lender Claim**

On the Effective Date, the Prepetition Lender Claim will be an Allowed Claim in the amount of $184,334,271.

(c)      **Treatment**

On the Effective Date, the Prepetition Lender will receive, after funding of the General Unsecured Convenience Class Claim Fund and payment of the DIP Claim, in full and final satisfaction, settlement, compromise, and release of, and in exchange for, its Allowed Prepetition Lender Claim:

(i)      Any distributions in accordance with the Sale Order;

(ii)     All remaining Net Sale Proceeds; and

(iii)    All remaining Net Residual Asset Proceeds.

In no event will the Prepetition Lender receive more than payment in full on account of the Prepetition Lender Claim.

**Class 4: CMB Secured Claim**

    (a)    **Classification, Impairment, and Voting**

Class 4 consists of the CMB Secured Claim against the Debtor. To the extent any of the CMB Litigation Claim or the CMB Arbitration Claim is an Allowed Claim, the Class 4 Claim is Unimpaired by the Plan and is therefore deemed to accept the Plan and not entitled to vote on the Plan.

    (b)    **CMB Secured Claim**

The CMB Secured Claim consists of the CMB Litigation Claim and the CMB Arbitration Claim, which are unliquidated, contingent, and disputed. The Debtor has obtained relief from the automatic stay so that the CMB Litigation Claim and CMB Arbitration Claim may be liquidated in a non-bankruptcy forum. To the extent such litigation results in any amounts being owed by the Debtor to CMB, CMB may recover from the CMB Letter of Credit, which will remain in place under the terms of the 2020 Plan. The Debtor reserves all rights with respect to the CMB Secured Claim.

    (c)    **Treatment**

Except to the extent that CMB and the Debtor or the Wind-Down Debtor, as applicable, agree to a less favorable or different treatment, on, or as soon as reasonably practicable after the later of the Effective Date or the date the CMB Litigation Claim and/or the CMB Arbitration Claim become an Allowed Claim, CMB will receive, in full and final satisfaction, settlement, and release, and in exchange for, such Claim, to the extent payable on account of any such Claim, the proceeds of the CMB Letter of Credit, which proceeds render Unimpaired any Allowed CMB Secured Claim in accordance with section 1124(1) or (2) of the Bankruptcy Code. For the avoidance of doubt, the Plan leaves unaltered all of CMB's legal, equitable, and contractual rights with respect to the CMB Letter of Credit. For the further avoidance of doubt, all components of the CMB Secured Claim remain subject to setoff with respect to all amounts owed by CMB to the Debtor.

**Class 5: Former Manager Claims**

    (a)    **Classification, Impairment, and Voting**

Class 5 consists of all Former Manager Claims against the Debtor. Class 5 Claims are Impaired by the Plan and are entitled to vote on the Plan.

    (b)    **Allowance of the Former Manager Claims**

On the Effective Date, each Former Manager will be deemed to have an Allowed Claim in the amount of $625,000.

    (c)    **Treatment**

Except to the extent that a Holder of a Former Manager Claim and the Debtor or the Wind-Down Debtor, as applicable, agree to a less favorable or different treatment, on, or as soon as

23

reasonably practicable after the Effective Date, each Holder of an Allowed Former Manager Claim will receive, in full and final satisfaction, settlement, and release, and in exchange for such Former Manager Claim, the treatment set forth in the Former Manager Settlement.

**Class 6: General Unsecured Claims**

(a)   **Classification, Impairment, and Voting**

Class 6 consists of all General Unsecured Claims against the Debtor, if any. Class 6 Claims are Impaired by the Plan and deemed to reject the Plan.

(b)   **Treatment**

On the Effective Date, all Class 6 General Unsecured Claims will be cancelled, released, and expunged without any Distribution on account of such Claims, and such Claims will be of no further force or effect.

**Class 7: General Unsecured Convenience Class Claims**

(a)   **Classification, Impairment, and Voting**

Class 7 consists of all General Unsecured Convenience Class Claims against the Debtor. Class 7 Claims are Impaired by the Plan and entitled to vote to accept or reject the Plan.

(b)   **Treatment**

Except to the extent that a Holder of a General Unsecured Convenience Class Claim and the Debtor or the Wind-Down Debtor, as applicable, agree to a less favorable or different treatment, on, or as soon as reasonably practicable after, the later of 90 days after the Effective Date or the date such General Unsecured Convenience Class Claim becomes an Allowed General Unsecured Convenience Class Claim, each Holder of an Allowed General Unsecured Convenience Class Claim will receive from the General Unsecured Convenience Class Claim Fund, in full and final satisfaction, settlement, and release, and in exchange for, such General Unsecured Convenience Class Claim:

(i)   Its pro rata share of the General Unsecured Convenience Class Claim Fund; and

(ii)   if such Holder votes to accept the Plan and opts-in to the releases provided in the Plan, such Holder will be deemed a Released Party for all purposes hereunder.

**Class 8:  Interests in Debtor Tonopah Solar Energy, LLC**

(a)   **Classification, Impairment, and Voting**

Class 8 consists of all Interests in TSE.  Because Holders of such Class 8 Interests will not receive any Distribution under the Plan, Holders of Class 8 Interests are deemed to reject the Plan and, therefore, are not entitled to vote on the Plan.

24

(b)      **Treatment**

On the Effective Date, Interests in TSE will be canceled, released, and expunged without any Distribution on account of such Interests, and such Interests will be of no further force or effect.

**ARTICLE IV**
**BACKGROUND AND DISCLOSURES**

4.1      **General Background**.

Additional information regarding the Debtor's business, capital structure, and the circumstances leading to the filing of this Chapter 11 Case is set forth in the *Declaration of Yale Scott Bogen in Support of Debtor's Chapter 11 Petition and First Day Motions* [D.I. 12] (the "First Day Declaration").

(a)      *Overview of the Debtor and the Debtor's History.*

As described in further detail in the First Day Declaration, the Debtor owns and operates the first of its kind, net 110-megawatt concentrated solar energy power plant (the "Power Plant") located in Tonopah in Nye County, Nevada.  As the first utility-scale concentrated solar power plant in the United States to be fully integrated with energy storage technology, the Power Plant operates by concentrating sunlight to heat molten salt.  Hot salt liquids can be super-heated to between 550°F to 1,050°F to create a source of heat energy.  The molten salt is maintained in a hot salt tank before it is transmitted to other areas of the Power Plant.  The Power Plant then converts heat energy to high pressurized steam, using the steam to spin a turbine connected to a generator that creates electricity for sale.  Significantly, the Power Plant has the capability to store and produce electricity at night, setting it apart from other solar power facilities.  The Power Plant's design is an innovative solution to the core limitation of renewable energy sources such as solar and wind—their intermittency.

The Debtor was formed in February 2008 by SolarReserve, Inc. ("SolarReserve") to develop a solar energy power plant in the Nevada desert. Also known as the Crescent Dunes Solar Energy Project, the Power Plant was designed to utilize a molten salt receiver to generate power. TSE entered into a power purchase agreement (the "First PPA") with Nevada Power Company d/b/a NV Energy ("NVE") in November 2009 for a twenty-five-year term.  NVE would be the exclusive offtake purchaser of the power generated by the Power Plant once construction of the Power Plant was complete.

In December 2009, SolarReserve applied for a loan guarantee from the Department of Energy (the "DOE"), and TSE executed an engineering, procurement and construction contract (the "EPC Contract") with Cobra Thermosolar Plants, Inc. ("CPI").  Under the EPC Contract, CPI agreed to provide engineering, procurement and construction services for the Power Plant at an initial fixed price amount of $766.4 million.  TSE also obtained equity investments from SolarReserve, Cobra Energy Investment, LLC ("CEI"), and Banco Santander, S.A.  The Power Plant commenced commercial operations and production in November 2015, upon synchronization with NVE's utility grid.  At that time, CPI operated the Power Plant.

25

The Debtor leases land from the Bureau of Land Management (the "BLM") and occupies 1,620 acres of land on a 2,250-acre site. The BLM lease term runs through December 31, 2039, with potential for renewal upon application to, and approval by, the BLM. The annual cost of the lease is $250,000 for 2025.

In addition, the Debtor holds purchased water rights and associated permits sufficient to meet the Power Plant's operational needs. The current permit provides for a combined water duty of up to 562.29 acre-feet, annually. The Power Plant is connected to the Nevada electricity grid via a 5.6 mil, 230kV transmission line that links the Power Plant to a nearby station. The Debtor also obtains operational support from third-party contractors. As of the Petition Date, the Debtor has no employees of its own.

(b)     *The 2020 Chapter 11 Case.*

In October 2016, the Power Plant suffered a leak in the hot salt tank that halted operations until July 2017. In March 2019, the Power Plant again suffered a leak in the hot salt tank that halted operations and prevented the Power Plant from generating revenue for over two years. Until October 2019, the electricity generated by the Power Plant was sold exclusively to NVE under the First PPA, and the Debtor's sole source of revenue was the sale of power under the First PPA. In the years following execution of the First PPA, however, the market price of renewable energy dropped significantly. Eager to free itself from the long-term obligation to purchase power at a price it no longer viewed as economic, NVE served a notice of default under the First PPA due to the operational difficulties at the Power Plant. Although TSE and CPI worked to cure the potential event of default within the applicable cure periods, NVE ultimately terminated the First PPA in October 2019.

In early 2020, facing serious liquidity issues, TSE began discussions with CPI, ACSSCE,[2] CEI, and the DOE, culminating in an agreement in principle for a restructuring support agreement (the "2020 RSA") to deleverage TSE through a pre-negotiated chapter 11 plan. TSE commenced a voluntary case (the "2020 Chapter 11 Case") under chapter 11 of the Bankruptcy Code on July 30, 2020. Under the terms of the 2020 RSA, TSE entered into that certain *Operation and Maintenance Agreement* dated as of July 30, 2020 with Cobra Industrial Services, Inc. ("CIS"),[3] which was approved by Bankruptcy Court order. Under the O&M Agreement, the O&M Operator operates the Power Plant.[4]

The restructuring implemented in the 2020 Chapter 11 Case included: (a) a $200 million cash payment to the DOE, plus potential deferred payments under the terms of a $100 million contingent note guaranteed by ACS to the DOE, with Cobra funding the Debtor's obligations under the 2020 Plan through new debt financing and an equity contribution; (b) mutual releases by TSE,

---

[2] "ACSSCE" refers to ACS Servicios, Comunicaciones y Energia S.A. ACSSCE is currently known as Dragados, S.A. and is the indirect parent of CDF and CDI.

[3] CIS is now known as ACS Industrial Activities, Inc. ("ACSIA" or the "O&M Operator").

[4] O&M Operator has generally collected a monthly management fee of $15,000 (subject to adjustment for inflation) and reimbursement for expenses under the O&M Agreement.

ACS, CPI, CEI, and the DOE of all claims on the terms set forth in the plan; (c) ownership of TSE by ACS,CPI, CEI or an affiliate thereof; and (d) the unimpairment of all other claims.

On December 9, 2020, the Bankruptcy Court entered the 2020 Confirmation Order approving TSE's chapter 11 plan (the "2020 Plan"), allowing TSE to emerge from bankruptcy with a significantly deleveraged balance sheet.

(c)      *Operations Post-Emergence from the 2020 Chapter 11 Case.*

The projections underlying the plan in the 2020 Chapter 11 Case assumed an energy sale price of $70/MWh and generation of 400 GWh per year. The Power Plant generation capacity was based upon reasonable expectations at the time that the Power Plant would be able to operate as originally planned once extensive repairs were completed.  The Debtor initially anticipated that the Power Plant would resume operations in October 2020.  After extensive remediation of the hot salt tank (including replacement of the baseplate and repair of the hot salt tank floor) and repair and maintenance of other Power Plant operating components and systems, the Plant restarted operations in July 2021 and resumed selling energy to NVE under a short-term PPA (the "Short-Term NVE PPA") for the summer months (through September 15, 2021).  The Short-Term NVE PPA was subsequently extended through January 15, 2022.

The Debtor had little leverage in negotiating the Short-Term NVE PPA, however.  The Power Plant relied on transmission capacity provided by NVE and therefore, as a practical matter, was unable to sell energy to any other party.  The resulting pricing under the Short-Term NVE PPA was significantly lower than the $70/MWh forecast in the 2020 Chapter 11 Case's disclosure statement.  Under the Short-Term NVE PPA, NVE agreed to pay only $21/MWh for most hours, and $63/MWh for a 7-hour peak pricing window, from 3:00 p.m. to 10:00 p.m. each day.  Moreover, NVE sold much of the transmission capacity that it had previously dedicated to transmit energy from the Power Plant to other energy producers.  NVE ultimately decreased the amount of energy it purchased from TSE to approximately 40 MWh.

On November 1, 2021, TSE entered into a new PPA with NVE (the "2021 PPA") with significantly better terms more closely aligned with the projections in the disclosure statement in the 2020 Chapter 11 Case.  Under the 2021 PPA, NVE agreed to a "take-or-pay" obligation for all energy produced at the Power Plant and available for delivery to NVE.  The pricing under the 2021 PPA also improved by: (i) expanding the peak pricing window to 12-hours, from noon to 12:00 a.m. each day, (ii) increasing non-peak pricing to $31.25/MWh, and (iii) increasing peak window pricing to $122.84/MWh from June through September (with no change in the peak price of $62.50/MWh from October through May).  The average sales price under the 2021 PPA in 2023 was $66.16/MWh, only five percent less than originally projected in the 2020 Chapter 11 Case's disclosure statement.

On February 14, 2022, a third hot salt tank leak led to another shutdown of the Power Plant. The tank was repaired, and the Power Plant resumed service on August 20, 2022.  A fourth leak shut down operations again in mid-February 2023, after which service resumed on July 13, 2023.

Remedying each leak required the shutdown of the Power Plant, the gradual cooling and draining of the hot salt tank, hot salt tank repairs, and restarting operations. The Debtor worked

27

with leading experts, including CADE Engineered Technologies ("CADE"), to inspect the hot salt tank, perform root cause analyses and provide recommendations for repairs and remediation designed to prevent additional leaks. Based on a study conducted by CADE, along with rigorous internal analysis, the Debtor determined to operate the hot salt tank at a lower temperature to reduce the risk of another hot salt tank leak and to reduce the wear and tear of extreme heat on certain other Power Plant components.

When the Power Plant resumed operations in July 2023, the temperature of the hot salt tank was reduced from its originally designed operating temperature of approximately 1,050°F to approximately 850°F. In the latter part of May 2024, the temperature of the hot salt tank was gradually raised to 890°F. The typical operating temperature of the hot salt tank today is approximately 890°F to a maximum of 900°F. Except for short-term stoppages for preventative and corrective maintenance, the Power Plant has remained in service since July 2023—over two and a half years without a leak or a leak-related shutdown.[5]

While lowering temperatures in the hot salt tank prevented further leaks, it also significantly reduced the Power Plant's energy production. Assuming no other operating issues and favorable weather/solar exposure, maximum production of the Power Plant is around 55 MWh, rather than upwards of 100 MWh when operating at 1,050°F, effectively reducing potential revenue generation by approximately 50%.

When NVE refused to extend the 2021 PPA at the end of 2024, the Power Plant went into standby mode and thus did not deliver energy from January through May 2025. Beginning in 2025, the Company was approached by, and commenced discussions with Switched On, LLC ("Switch") to enter into a new PPA. On May 30, 2025, the Company and Switch entered into a short-term PPA (the "Switch Short-Term PPA") with an initial term of 30 days, subject to extensions by mutual agreement of the parties. Switch initially purchased energy from the Power Plant under the Short-Term PPA for $15/MWh. On July 1, 2025, the energy purchase price increased to $90/MWh. The Power Plant is operating under the Switch Short-Term PPA, which currently expires on April 23, 2026.

(d)      *Nevada District Court Action, ICC Arbitration, and Qui Tam Action.*

In connection with the funding of certain equity commitments for the development and construction of the Power Plant, CMB Infrastructure Investment Group IX, LP ("CMB Group IX"), CMB Infrastructure Investment Group XI, LP ("CMB Group XI"), and CMB Export, LLC ("CMBE" and, together with CMB Group IX and CMB Group XI, "CMB") extended loans to an indirect subsidiary of SolarReserve and to Cobra Energy Investment Finance, LLC ("Cobra Finance"), as follows:

> (a) CMB Group XI loaned $80 million to Cobra Finance to fund CEI's equity interest in TSE. Cobra Instalaciones y Servicios S.A.

---

[5] On September 19, 2025, one of the Power Plant's evaporators suffered a failure, forcing the Power Plant to temporarily shut down for maintenance. The Power Plant resumed operations on November 6, 2025, after the evaporator was inspected and repaired.

28

("Cobra Instalaciones") guaranteed the loan, which was fully repaid in April 2018 following ACS's issuance of a Green Bond.

(b) CMB Group IX loaned $90 million to SolarReserve CSP Finance LLC ("SolarReserve Finance"), to fund SolarReserve CSP Holdings, LLP's equity interest in TSE (the "SolarReserve Loan"). SolarReserve Finance allegedly failed to repay a significant portion of the $90 million SolarReserve Loan.[6]

CMB initiated litigation against: (a) Cobra Finance, CEI, CIS, CPI, and Cobra Instalaciones (collectively, the "Cobra Defendants"); (b) ACSSCE; (c) TSE; and (d) Banco Santander, S.A. ("Santander") (TSE, ACSSCE, and the Cobra Defendants are referred to collectively as "Defendants").[7]

The CMB Litigation includes the Nevada District Court Action, ICC Arbitration, CMB Judgment Appeal, *Qui Tam* Action, and CMBE *Qui Tam* Appeal. Each of these litigation matters is discussed in more detail in the First Day Declaration.

In the Nevada District Court Action, CMB asserted a variety of contract and tort claims, with the goal of recovering the $90 million debt that SolarReserve allegedly failed to repay to CMB Group IX. In November 2021, the court granted a motion to compel arbitration and stayed the action pending arbitration.

On February 4, 2022, CMB initiated the ICC Arbitration with the International Chamber of Commerce International Court of Arbitration (the "ICC") against the Defendants. On January 12, 2024, the ICC issued an award that rejected all claims CMB brought on its own behalf (*i.e.*, Claims 1 through 5). The ICC determined it did not have jurisdiction to decide the claims CMB brought as SolarReserve's purported assignee (*i.e.*, Counts 7 through 10), so it did not decide those claims. The ICC also awarded the Defendants $2,437,221 in attorneys' fees and costs, payable jointly and severally by CMB (the "Award").

The Nevada District Court confirmed the Award (denying CMB's motion to vacate the Award), awarded pre- and post- judgment interest on the Award, and granted the Defendants' motion to compel arbitration of Claims 7-10. On June 17, 2025, the Nevada District Court entered judgment (the "Judgment") in favor of the Defendants against CMB with respect to Claims 1 through 5 of the Amended Complaint in the amount of $2,437,221 as awarded by the ICC, plus $80,025.52 in prejudgment interest, and post-judgment interest computed daily from October 15, 2024 to the date of payment at a rate of 4.22%, compounded annually. On July 11, 2025, CMB submitted its request for arbitration of Claims 7-10 to the ICC Tribunal. CMB also filed a Notice of Appeal from the Judgment to the United States Court of Appeals for the Ninth Circuit, commencing Case No. 25-4430. CMB paid the Judgment on October 30, 2025.

---

[6] SolarReserve ultimately initiated a liquidation process in late 2019, through which it assigned certain assets and legal causes of action to its creditors, including CMB Group IX.

[7] Santander was later dismissed from the Nevada District Court Action, the only litigation to which it was a party. The Debtor therefore does not refer to Santander among the "Defendants".

Separately, on January 28, 2020, CMB Export, LLC, as relator, filed a *qui tam* action in the Nevada District Court against the Defendants other than Santander, Case No.: 2:20-cv-00196-JCM-DJA (the "*Qui Tam* Action") alleging violations of the False Claims Act in connection with cash grants from the U.S. Department of the Treasury made available to TSE under Section 1603 of the American Recovery and Reinvestment Tax Act.

While the case was under seal, the United States Department of Justice (the "DOJ") investigated CMB's allegations and, on June 1, 2023, declined to intervene. On January 24, 2024, the case was unsealed. On April 19, 2024, CMB filed a second amended complaint, adding Cobra Concesiones, S.L. as an additional defendant.

On November 7, 2024, the DOJ filed a motion to intervene in the *Qui Tam* Action and to dismiss the action under a section of the False Claims Act that allows for intervention for purposes of dismissal by the government, 31 U.S.C. § 3730(c)(2)(A).

On July 18, 2025, the Nevada District Court granted the DOJ's motion to dismiss the *Qui Tam* Action. CMBE appealed the dismissal to the Ninth Circuit Court of Appeals, commencing Case No. 25-5835 (the "CMBE *Qui Tam* Appeal"), on September 12, 2025. Briefing in the CMBE *Qui Tam* Appeal is ongoing. On April 2, 2026, the DOJ filed an answering brief in support of the district court's order granting its motion to dismiss the *Qui Tam* Action. Based on the Nevada District Court's dismissal of the *Qui Tam* Action, which has not been reversed by the Ninth Circuit Court of Appeals, this Plan does not provide for any treatment of the CMB Qui Tam Claim, and to the extent the CMB Qui Tam Claim is asserted in the CMB Proofs of Claim, the Debtor objects and has filed a formal objection to such claims.

       (e)     *Events Leading to This Chapter 11 Case.*

In the second half of 2024, TSE sought to sell the Power Plant with the assistance of its former investment banker. Given the nature of the Debtor's assets, the universe of potential buyers was necessarily limited. Nevertheless, TSE undertook a widespread marketing campaign with targeted outreach to over 120 strategic and financial buyers. While several parties received a confidential information memorandum and executed confidentiality agreements, this initial marketing process did not lead to an actionable offer.

In March 2025, TSE appointed two independent managers to the board and established a special committee comprised of the two independent managers (the "Special Committee"), to conduct an investigation (a) of the transactions between TSE, Crescent Dunes Finance, Inc. ("CDF"), ACS Servicios Comunicaciones y Energía S.L.1,[8] Cobra Thermosolar Plants, Inc. ("Cobra TP"),[9] and Cobra Energy Investment, LLC ("CEI")[10] (ACS Servicios Comunicaciones y Energía S.L., Cobra TP, and CEI, collectively, "Cobra"), and their respective successors or affiliates; and (b) of potential claims and causes of action held by TSE against CDF, Cobra, or their respective successors or affiliates. The Special Committee retained Morris, Nichols, Arsht

---

[8] ACS Servicios Comunicaciones y Energía S.L. merged with Dragados, S.A., with Dragados, S.A. as the surviving entity.

[9] Now known as ACS Thermosolar Plants, Inc.

[10] Now known as ACS Energy Investment, LLC.

& Tunnell LLP ("Morris Nichols") as independent counsel and Teneo Capital LLC ("Teneo") as independent financial advisor. Morris Nichols and Teneo issued two investigation reports, which concluded that the Loans extended under the Prepetition Loan Agreement are valid, first-priority, and perfected, subject to limited caveats and that there are no material claims or causes of action against insiders.

In May 2025, TSE hired SSG to continue its sale efforts. SSG recommenced the marketing process and worked with TSE to prepare a teaser, confidential information memorandum ("CIM"), virtual data room buyer list and other related diligence materials. TSE formally launched its renewed marketing process on May 21, 2025, with the targeted distribution of teasers to potential acquirers followed by the distribution of more substantive materials upon interested parties' execution of a non-disclosure agreement. SSG contacted 253 potential buyers—129 strategic buyers that were selected based on their business model, historical acquisition activity and financial capabilities and 124 financial buyers and investors that were selected based on their historical interest in the solar energy industry, existing and past investments and financial capabilities. As of the Petition Date, 13 of those parties had executed confidentiality agreements and received the CIM and related information as well as virtual data room access.

Several parties indicated interest in acquiring the Debtor's assets. The Debtor engaged in advanced discussions with one potential buyer, which delivered the Debtor a non-binding term sheet contemplating a purchase of the Debtor's assets through an in-court sale process. The parties entered into an exclusivity agreement to allow them to try to negotiate a stalking horse asset purchase agreement. Despite the exclusivity agreement, which was ultimately extended through October 15, 2025, the Debtor and SSG were free to continue marketing the Debtor's assets and to facilitate diligence by other parties; as the Debtor only agreed that it would not directly or indirectly solicit, negotiate, or enter into an alternative transaction. The prepetition marking process unfortunately did not result in an actionable bid for the Debtor's assets, however.

On December 16, 2025, the Debtor, CDF, CDI, and ACSIA entered into the RSA, which contemplates a sale transaction and pre-negotiated chapter 11 plan.[11] The RSA establishes financial and other support for a sale and provides the basis for the Debtor to effectuate the Wind-Down.

The Debtor commenced this Chapter 11 Case after exploring strategic alternatives and commencing two extensive prepetition marketing and sale processes intended to obtain the highest or otherwise best offer for the Power Plant. The Debtor expects to incur sizable financial operating losses under its current business model, as it lacks a long-term PPA and needs to rely on continuous cash infusions from its affiliates. Running the Power Plant at a temperature high enough to generate revenue sufficient to sustain current operations materially increases the risk of additional hot salt tank leaks. The Debtor and its advisors believe that a sale, coupled with additional investment and technological and capital advancement, can convert TSE's promising technology into sustainable profitability.

---

[11] An organizational chart showing the relationship among the Debtor, CDF, CDI, and ACSIA is attached at **Exhibit C**.

31

4.2     **Overview of the Debtor's Prepetition Debt**.

The Debtor is party to the Prepetition Loan Agreement that was approved by the Bankruptcy Court as exit financing in connection with the 2020 Chapter 11 Case.

The Prepetition Loan Agreement provided for a term loan of $100 million (the "Prepetition Term Loan") and a revolving line of credit not to exceed $64 million (the "Prepetition Line of Credit" and, together with the Prepetition Term Loan the "Loan"). The Loan bears interest at a rate of 2.9% per year. The Loan was amended once, in August 2025, to increase the amount of the line of credit to provide funding in anticipation of this Chapter 11 Case, and has not otherwise been amended or modified.

The obligations under the Prepetition Loan Agreement are secured by a first-priority lien on substantially all of the Debtor's assets, which the Bankruptcy Court approved in the 2020 Chapter 11 Case. Additionally, as a condition precedent to the entry into the Prepetition Loan Agreement, CDI executed that certain Prepetition Equity Pledge Agreement with the Prepetition Lender, whereby CDI granted to the Prepetition Lender a lien on and continuing security interest in, all of its right, title and interest in all limited liability company interests and other equity interests of TSE, as well as proceeds thereof.

As of October 2022, the Prepetition Line of Credit was fully extended. After October 2023, TSE stopped paying interest (and has never made any principal repayments). From and after that time, until the line of credit was amended on August 29, 2025, the Prepetition Lender continued to contribute additional funds to TSE. The Prepetition Lender contributed approximately $52.9 million to TSE after the Prepetition Line of Credit was fully extended, which the Prepetition Lender agreed to treat as equity contributions. The Prepetition Lender also agreed to provide financing to TSE in anticipation of this Chapter 11 Case, and TSE and the Prepetition Lender entered into that certain *Amendment and Forbearance Agreement* dated as of August 29, 2025, which increased the amount of the Prepetition Line of Credit from $64 million to $73.5 million.

As of the Petition Date, the Debtor owed the Prepetition Lender the aggregate amount of approximately $173 million (plus accrued interest, costs, and fees).

4.3     **Prepetition Indemnification Obligations**

The Debtor assumed certain indemnification obligations under the 2020 Plan, which have been asserted in this case as contingent and unliquidated claims.

4.4     **The Debtor's Chapter 11 Case**.

(a)     *Generally*.

As set forth above, on the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of that date. The Bankruptcy Code provides that a debtor is authorized to continue to operate its business and remain in possession of its property as a "debtor in possession." From the

Petition Date, the Debtor has continued to operate its business and manage its properties as Debtor and debtor in possession.

The filing of the Debtor's bankruptcy petition on the Petition Date triggered the immediate imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of Liens against property of the Debtor and both the commencement and the continuation of prepetition litigation against the Debtor.  With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay remains in effect from the Petition Date until the Effective Date of the Plan.

The Debtor commenced this Chapter 11 Case to address financial and operational challenges related to the Power Plant, and to effectuate one or more Sale Transactions with respect to its assets.

(b)    *First Day Motions and Orders.*

On the Petition Date, the Debtor filed a number of "first day" motions and applications designed to facilitate the Debtor's smooth transition into chapter 11 and maximize the value of the Debtor's assets.  The Bankruptcy Court approved all of the Debtor's first day motions by entering interim and final orders, including:

- *156(c) Claims Agent Retention*. On January 23, 2026, the Bankruptcy Court entered an order [D.I. 40] approving the retention of Epiq Corporate Restructuring, LLC as the Debtor's claims and noticing agent;

- *DIP Financing*. On January 23, 2026, the Bankruptcy Court entered an interim order [D.I. 49], and on February 13, 2026, the Bankruptcy Court entered a final order [D.I. 110], authorizing the Debtor to obtain postpetition financing and use cash collateral, and granted adequate protection to the Prepetition Lender and approved related relief;

- *Cash Management*. On January 23, 2026, the Bankruptcy Court entered an interim order [D.I. 47], and on February 13, 2026, the Bankruptcy Court entered a final order [D.I. 106], authorizing the Debtor to continue to maintain its cash management system and granted related relief;

- *Compensation Obligations*. On January 23, 2026, the Bankruptcy Court entered an interim order [D.I. 46], and on February 13, 2026, the Bankruptcy Cour entered a final order [D.I. 105], authorizing the Debtor to honor and pay prepetition compensation obligations;

- *Customer Programs.* On January 23, 2026, the Bankruptcy Court entered an interim order [D.I. 48], and on February 13, 2026, the Bankruptcy Court entered a final order [D.I. 107], authorizing the Debtor to maintain and administer its customer programs and honor related prepetition business practices;

33

- *Insurance.* On April 1, 2026, the Bankruptcy Court entered a final order [D.I. 205] authorizing the Debtor to continue to maintain its insurance programs and honor and pay prepetition insurance obligations;

- *Prepetition Taxes.* On January 23, 2026, the Bankruptcy Court entered an interim order [D.I. 43], and on February 13, 2026, the Bankruptcy Court entered a final order [D.I. 104], authorizing the Debtor to pay certain prepetition taxes and fees and related obligations; and

- *Utilities.* On January 23, 2026, the Bankruptcy Court entered an interim order [D.I. 42], and on February 13, 2026, the Bankruptcy Court entered a final order [D.I. 103], prohibiting utility companies from altering, refusing, or discontinuing utility services, deeming utility services adequately assured of future payment, establishing procedures for determining additional adequate assurance of payment, and granting related relief.

    (c)    *Retention of Professional Advisors and Related Pleadings.*

The Bankruptcy Code requires that debtors obtain court approval to retain and pay their professionals who will assist them in the bankruptcy case. As set forth below, the Bankruptcy Court has approved the Debtor's retention of certain professionals to represent the Debtor and assist it in carrying out its duties in this case.

    i.    ***DLA Piper (LLP) – Counsel for the Debtor.***

The Debtor retained the law firm of DLA Piper LLP (US) as its general bankruptcy counsel in this case. The Bankruptcy Court entered an order [D.I. 123] approving DLA Piper's retention on February 17, 2026.

    ii.    ***Development Specialists Inc. – Chief Restructuring Advisor for the Debtor.***

The Debtor engaged Development Specialists, Inc. to provide the services of Yale Scott Bogen as Chief Restructuring Officer, and to provide additional supporting personnel. The Bankruptcy Court entered an order [D.I. 111] approving DSI's engagement on February 13, 2026.

    iii.    ***SSG Advisors, LLC – Investment Banker for the Debtor.***

The Debtor retained SSG Advisor, LLC as its investment banker in this case. The Bankruptcy Court entered an order [D.I. 115] approving the SSG's retention on February 13, 2026.

    iv.    ***Epiq Corporate Restructuring, LLC. – Administrative Advisor for the Debtor.***

The Debtor retained Epiq Corporate Restructuring, LLC as its administrative advisor in this case. The Bankruptcy Court entered an order [D.I. 113] approving Epiq's retention on February 13, 2026.

34

> v. ***Kelley Drye & Warren LLP – Special Litigation Counsel for the Debtor***.

The Debtor retained the law firm Kelley Drye & Warren LLP, as special litigation counsel, to continue representing the Debtor in connection with the CMB Litigation in Nevada. The Bankruptcy Court entered an order [D.I. 112] approving Kelley Drye's retention on February 13, 2026.

> vi. ***Debevoise & Plimpton LLP – Bankruptcy Co-Counsel for the Debtor***.

The Debtor retained the law firm Debevoise & Plimpton LLP as its bankruptcy co-counsel in this case. The Bankruptcy Court entered an order [D.I. 171] approving Debevoise's retention on March 17, 2026.

> vii. ***Ordinary Course Professionals***.

On January 28, 2026, the Debtor filed a motion [D.I. 53] to employ non-bankruptcy professionals in the ordinary course of business (the "OCP Motion"). The Bankruptcy Court entered an order [D.I. 109] approving the OCP Motion on February 13, 2026.

> viii. ***Interim Compensation Procedures***.

On January 28, 2026, the Debtor filed a motion [D.I. 52] to establish standard procedures for interim compensation and reimbursement of professionals (the "Interim Compensation Procedures Motion"). The Bankruptcy Court entered an order [D.I. 108] approving the Interim Compensation Procedures Motion February 13, 2026.

> (d) *Claims Process and Bar Dates*.

> i. *Schedules & Statements*.

The Debtor filed its Schedules of Assets and Liabilities and Statement of Financial Affairs (the "SOFA") [D.I. 75] with the Bankruptcy Court, each of which is incorporated hereto in their entirety by reference. Among other things, the Debtor's SOFA lists the Debtor's current managers who are Released Parties under this Plan, as well as transfers made to the Debtor's officers and managers within a year of the Petition Date and other transfers made to the Debtor's non-insider creditors within 90 days of the Petition Date.

> ii. *Section 341(a) Meeting of Creditors*.

The section 341(a) meeting of creditors was held and concluded on February 26, 2026, at 1:00 p.m. (ET) [D.I. 142].

*iii.    Claims Process and Bar Dates.*

On February 17, 2025, the Bankruptcy Court entered an order [D.I. 122] establishing deadlines for filing proofs of claim and granting related relief (the "Bar Date Order"). The Bar Date Order set the following deadlines:

(1)    General Bar Date: March 18, 2026, at 4:00 p.m. (ET) as the deadline for each person or Entity other than a Governmental Unit to file a Proof Claim in respect of a prepetition Claim against the Debtor;

(2)    Governmental Bar Date: July 20, 2026, at 4:00 p.m. (ET) as the deadline for Governmental Units to file a Proof of Claim in respect of a prepetition Claim against the Debtor;

(3)    Amended Schedules Bar Date: the later of (i) the General Bar Date or the Governmental Bar Date, as applicable; and (ii) 4:00 p.m. (ET) on the date that is thirty (30) days after the date on which the Debtor provides notice of an amendment or supplement to the Schedules;

(4)    Rejection Damages Bar Date: the later of (i) the General Bar Date; (ii) 30 days after the Claimant is served with notice of the applicable Bankruptcy Court order authorizing the rejection of the Executory Contract or Lease at issue; or (iii) any other date that the Court may fix in the applicable rejection order for the Rejection Damages Claims Bar Date as the deadline for the non-debtor counterparty to the applicable rejected executory contracts and leases to file Proofs of Claim based on any relief set forth in the applicable rejection order.

The Debtor served the Bar Date Order and applicable bar date notice on February 17, 2026.

(e)    *Relief from Stay.*

On January 21, 2026, the Debtor filed a motion for relief from the automatic stay [D.I. 14] to allow all litigation with CMB to proceed in the ordinary course. On February 13, 2026, the Bankruptcy Court entered the order approving the Automatic Stay Motion [D.I. 116].

(f)    *Bidding Procedures and the Sale of Substantially All of the Debtor's Assets.*

In connection with the goal of continuing its prepetition marketing efforts and entering into a transaction for the highest or otherwise best offer for all or substantially all of its assets, on the Petition Date, the Debtor filed the Bidding Procedures Motion [D.I. 18]. The Bidding Procedures Order was subsequently entered on February 10, 2026 [D.I. 80].

Under the Bidding Procedures, the Debtor reserved the right to designate a stalking horse bidder and to request bid protections in the form of a break-up fee and/or expense reimbursement for such stalking horse bidder by an appropriate motion to the Court. The Debtor's postpetition marketing process complied with the Bidding Procedures in all respects. The Bidding Procedures Order designated February 20, 2026, at 4:00 p.m. (ET) as the deadline to designate a stalking horse bidder and enter into a stalking horse asset purchase agreement.

In November 2025, Sons of Liberty Construction, Inc. ("SOLC" or the "Stalking Horse Bidder") expressed interest in the Debtor's assets, and in December 2025, the Debtor provided SOLC with access to the virtual data room and a site visit. Following the Petition Date, the Debtor continued to advance discussions with SOLC regarding a potential bid, including its interest in serving as a stalking horse in a potential transaction.

The Debtor, with the assistance of SSG, designated SOLC as a stalking horse bidder. On February 20, 2026, the Debtor and the Stalking Horse Bidder entered into that certain Asset Purchase Agreement (the "Stalking Horse APA"), which embodies the Stalking Horse Bidder's bid (the "Stalking Horse Bid"). To induce the Stalking Horse Bidder to expend the time, energy, and resources necessary to negotiate and ultimately execute the Stalking Horse APA, which benefits the Estate through promoting competition to maximize the value of the Debtor's assets, and to keep the Stalking Horse Bid open and irrevocable through the sale process, the Debtor agreed to provide the Stalking Horse Bidder with expense reimbursement for its reasonable and documented expenses in conjunction with Stalking Horse Bid up to a maximum amount of $175,000 (the "Expense Reimbursement") in the event that the Stalking Horse APA is validly terminated in in accordance with Sections 9.1(c) or Section 9.1(f) thereof. The Expense Reimbursement will only be payable to the Stalking Horse Bidder upon the consummation of a transaction with an Alternative Bidder (as such term is defined the Stalking Horse APA.

On February 20, 2026, the Debtor filed the supplement (the "Bidding Procedures Supplement") to the Bidding Procedures Motion [D.I. 131] seeking (i) approval of SOLC as the Stalking Horse Bidder, (ii) approval of the Debtor's entry into the Stalking Horse APA, (iii) approving of the Expense Reimbursement, and (iv) related relief. On March 6, 2026, the Court entered an order [D.I. 152] approving the Bidding Procedures Supplement.

Following the Bid Deadline, on March 2, 2026, the Debtor filed the *Notice of Successful Bidder and Cancellation of Auction* [D.I. 146]. As a result, the Stalking Horse Bidder was the successful bidder and the Auction was cancelled.

Following a hearing on March 19, 2026, the Court entered the Sale Order [D.I. 184] approving and authorizing sale of the Debtor's assets to the Stalking Horse Bidder pursuant to the Stalking Horse APA.

(g)     *Indemnification Settlements.*

Following the Petition Date, the Debtor and the Former Managers engaged in discussions regarding the Former Managers' indemnification claims that were assumed by the Debtor in the 2020 Case and an appropriate treatment of the parties' respective rights with respect to the Indemnification Escrow Account. Following good-faith negotiations, the Debtor and the Former Managers ultimately executed that certain term sheet attached hereto as **Exhibit B**, the terms of which are incorporated herein.

Separately, on March 16, 2026, the Debtor and Mark Manski executed that certain *Settlement Agreement and Mutual Release*, which resolved Mr. Manski's respective claims to indemnification and with respect to the Indemnification Escrow Account, as well as with respect to Mr. Manski's independent consulting relationship with the Debtor. The hearing on the Debtor's

37

motion for approval of the Debtor's settlement with Mr. Manski is scheduled for June 25, 2026, at 10:00 a.m. (Eastern Time).

        (h)    *Trustee Motion*

On April 8, 2026, CMB filed a motion seeking appointment of a chapter 11 trustee [D.I. 220] (the "Trustee Motion"). The Debtor strongly disputes the allegations in the Trustee Motion and filed an objection [D.I. 256] to the Trustee Motion on April 23, 2026.

        (i)    *Plan Formulation, Investigation of Potential Estate Claims and Causes of Action, and Debtor Release.*

In formulating the terms of this Plan, including the Debtor Release, the Debtor and the Special Committee, with the assistance of their advisors, undertook a careful and comprehensive review of potential claims and causes of action—and whether and to what extent such potential claims and causes of action may serve as a viable source of distributable net value for the benefit of holders of Allowed Claims or Interests, taking into account the foreseeable costs, time and inherent uncertainty associated with litigation (the "Investigation").

On July 18, 2025, Morris Nichols and Teneo issued the *Tonopah Special Committee Investigation Phase I Report*, which concluded that Prepetition Lender's prepetition claims against the Debtor are valid, properly perfected, and unavoidable.[12] On August 18, 2025, Morris Nichols and Teneo issued the *Tonopah Special Committee Investigation Phase II Report*, which concluded that the Debtor does not hold any material claims or causes of action against CDF and Cobra, or any of their respective successors or affiliates.

In evaluating the Special Committee's report, the Debtor considered that the Bankruptcy Court previously approved broad releases by the Debtor under the 2020 Plan, including as to Cobra (as defined in the 2020 Plan to include ACS Servicios Comunicaciones y Energia S.L., Cobra Thermosolar Plants, Inc., and Cobra Energy Investment, LLC, as well as, *inter alia*, all parents, affiliates, subsidiaries, predecessors, successors and assigns of such parties). The 2020 Plan was confirmed by the 2020 Confirmation Order. Given the effect of such releases that were approved by the Bankruptcy Court, the Special Committee investigated transactions between the Debtor and insiders following the Debtor's emergence from bankruptcy after the 2020 Case. The Prepetition Loans are the same loans that the Bankruptcy Court approved under the 2020 Plan, and the majority of transactions with CDF and Cobra, and their respective successors or affiliates, since the 2020 Case were limited to the Debtor's payment of passthrough employee costs under the O&M Agreement, which was also approved by the Bankruptcy Court in the 2020 Case. As a result, the Debtor agrees with the Special Committee's conclusion that there are no material claims or causes of action against insiders.

The Plan provides the best possible means to conclude the Chapter 11 Case and make Distributions to creditors.

---

[12] The Phase I Report also concluded that CDF properly perfected its liens in all of TSE's assets, with the exception of certain categories (for example, copyrights) that do not exist or have *de minimis* value.

**ARTICLE V**
**CONFIRMATION AND VOTING PROCEDURES**

5.1    **Confirmation Procedure**.

On May 13, 2026, the Bankruptcy Court entered the Interim Approval and Procedures Order conditionally approving the Combined Disclosure Statement and Plan for solicitation purposes only and authorizing the Debtor to solicit votes to accept or reject the Plan.  The Confirmation Hearing has been scheduled for June 25, 2026, at 10:00 a.m. (Eastern Time) to consider (a) final approval of the Combined Disclosure Statement and Plan as providing adequate information under section 1125 of the Bankruptcy Code and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by the Debtor without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

5.2    **Procedure for Objections**.

Any Objection to final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Plan must be made in writing, filed with the Bankruptcy Court and served on the following proposed parties: (a) counsel to the Debtor, DLA Piper LLP (US) (i) 1201 North Market Street, Suite 2100 Wilmington, Delaware 19801 (Attn: Aaron S. Applebaum at aaron.applebaum@us.dlapiper.com) and (ii) 1251 Avenue of the Americas New York, New York 10020 (Attn: David M. Riley, Esq. at david.riley@us.dlapiper.com); (b) co-counsel to the Debtor, Debevoise & Plimpton LLP, 6 Hudson Boulevard, New York, New York 10001 (Attn: Rachel Ehrlich Albanese at ralbanese@debevoise.com); (c) counsel for the DIP Lender and the Prepetition Lender, Kelley Drye & Warren LLP, 3 World Trade Center, New York, NY 10007, (Attn: Joel S. Rublin at jrublin@kelleydrye.com, Eric R. Wilson at ewilson@kelleydrye.com, and Nathan S. Greenberg at ngreenberg@kelleydrye.com) and Ice Miller LLP, 500 Delaware Avenue, Wilmington, Delaware 19801 (Attn.: Christopher M. Samis at Christopher.samis@icemiller.com and R. Stephen McNeill at Stephen.mcneill@icemiller.com); (d) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Benjamin Hackman at Benjamin.A.Hackman@usdoj.gov), by no later than June 15, 2026 at 4:00 p.m. (Eastern Time). Unless an Objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

5.3    **Requirements for Confirmation**.

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code.  Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) must be feasible.  The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

39

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing will be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

5.4 **Classification of Claims and Interests**.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified). The Debtor is required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtor believes that the Plan complies with this standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the affected holders of Claims or Interests do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The Debtor believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a holder of a Claim or Interest may challenge the classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If this occurs, the Debtor intends, in accordance with the terms of the Plan, to make such modifications to the Plan as may be necessary to permit its confirmation. Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT, REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

The amount of any Impaired Claim ultimately Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained in this document with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates and/or the actual Distribution received by creditors. The projected recoveries are based on information available to the Debtor as of the date hereof and reflect the Debtor's views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized in this Combined Disclosure Statement and Plan. The Debtor believes that the consideration, if any, provided under the Plan to holders of Claims reflects an appropriate resolution of their Claims, taking into account the differing nature and priority of such Claims and Interests. The Bankruptcy Court must find that a number of statutory tests are met before it may confirm the Plan, however. Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

Except as expressly provided in the Plan, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtor and the Wind-Down Debtor reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## 5.5    **Impaired Claims or Interests**.

Pursuant to section 1126 of the Bankruptcy Code, only classes of claims or interests that are Impaired under a plan may vote to accept or reject such plan. Under section 1124 of the Bankruptcy Code, a claim or interest is Impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an Impaired Class do not receive or retain any property under a plan on account of such claims or interests, such Impaired Class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Classes 3, 5, and 7 are Impaired and are entitled to vote on the Plan. Holders of Claims and Interests in Classes 6 and 8 are Impaired and will not receive or retain any property under the Plan on account of such Interests and, therefore, are not entitled to vote on the Plan and are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code. Under the Plan, holders of Claims in Classes 1, 2, and 4 are Unimpaired and, therefore, are not entitled to vote on the Plan and are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code.

41

5.6     **Special Provision Governing Unimpaired Claims**.

Except as otherwise provided in the Plan, nothing under the Plan affects the Debtor's or the Wind-Down Debtor's rights regarding any Unimpaired Claims, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

5.7     **Confirmation without Necessary Acceptances**

Section 1129(a)(10) of the Bankruptcy Code, to the extent applicable, will be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.

In the event that any Impaired Class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all Impaired Classes, if the plan has been accepted by at least one Impaired Class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code requires that a court find that a plan "does not discriminate unfairly" and is "fair and equitable," with respect to each non-accepting Impaired Class of claims or interests.  Here, because Holders of Claims and Interests in Classes 6 and 8 are deemed to reject the Plan, the Debtor may seek confirmation of the Plan by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  The Debtor believes that such requirements are satisfied, as no Holder of an Interest junior to those in Classes 6 or 8 will receive any Estate property under the Plan.  In addition, the Debtor reserves the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests.  The Debtor believes that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  Accordingly, the Debtor believes that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

(a)     *Secured Creditors*.  Either (i) each Impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each Impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property

42

securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b)     *Unsecured Creditors*.  Either (i) each Impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the Plan.

(c)     *Equity Interests*.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtor believes that the Distributions provided under the Plan satisfy the absolute priority rule, where required.

## 5.8     **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor (unless such liquidation or reorganization is proposed in the Plan).  Based on the Debtor's analysis, the Wind-Down Debtor will have sufficient assets to accomplish its tasks under the Plan.  Therefore, the Debtor believes that liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

## 5.9     **Best Interests Test and Liquidation Analysis**

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are Impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an Impaired Class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable Distribution to holders of each Impaired Class of claims and interests if a debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code.  To determine if a plan is in the best interests of each Impaired class, the present value of the Distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such Impaired classes under the plan.  If the hypothetical liquidation distribution to holders of claims or interests in any Impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such Impaired class.

43

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, there would be additional costs, expenses, and delays that the Estate would incur as a result of liquidating the Estate in a chapter 7 case. The Debtor believes that creditors will receive larger and faster Distributions than they would in any chapter 7 liquidation.

The costs of liquidation would include compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtor believes such amount would exceed the expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtor. Conversion also would likely delay the liquidation process and, ultimately, Distribution of the Residual Assets. The Estate would also be obligated to pay all unpaid expenses incurred by the Debtor during the Chapter 11 Case (such as compensation for Professionals) that are allowed in the chapter 7 cases. Ultimately, the Prepetition Lender would need to consent to the use of its cash collateral to fund such a chapter 7 process, and there is no assurance they would do so.

For a more detailed description of a hypothetical liquidation scenario under chapter 7 as compared to the Plan, please also refer to the liquidation analysis attached hereto as **Exhibit A**, which is incorporated by reference.

The Debtor believes that holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Case was converted to chapter 7 cases, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code. In a chapter 7 liquidation, all assets of the Debtor would be liquidated and all proceeds would go to the Prepetition Lender on account of its secured claim. In the Chapter 11 Case, however, Prepetition Lender is gifting a portion of its collateral, or the proceeds of its collateral, to provide for substantial recoveries for the Debtor's General Unsecured Convenience Class. The Former Manager Settlement also includes a mechanism for additional recovery in the Chapter 11 Case. Neither the gift distribution nor the Former Manager Settlement is available in a chapter 7 scenario.

### 5.10    Releases & Exculpations

The Plan proposes to release the Released Parties and exculpate the Exculpated Parties. The Debtor releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtor's overall restructuring efforts and were essential in obtaining such parties' support for the Wind-Down, Sale Transaction, and the Plan.

The Released Parties and the Exculpated Parties, including current directors, officers, and managers, have made substantial and valuable contributions to the Debtor's restructuring through efforts to market, negotiate, and implement the Wind-Down, the Sale Transaction and the Plan, which, in the case of the Wind-Down and Sale Transaction, maximizes the value of the Debtor's assets for all parties in interest. The proposed releases and exculpations preserve value by enabling the Debtor to exit chapter 11 swiftly while giving finality to stakeholders that elect to give and receive consensual third-party releases.

Based on the foregoing, the Debtor believes that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standards. Moreover, the Debtor will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The releases, exculpation, and injunction provisions are set forth in Article VIII hereof.

### 5.11    **Acceptance of the Plan**

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of Ballots are set forth in the Interim Approval and Procedures Order.

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of Insiders, must actually vote to accept the Plan.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, THE DEBTOR URGES YOU TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. Please be sure to complete the Ballot properly and legibly and to identify the exact amount of your Claim and the name of the Holder. If you are a Holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, you received a damaged Ballot, or you lost your Ballot, or if you have any questions concerning the Plan or procedures for voting on the Plan, please contact the Claims Agent via e-mail Tonopah@epiqglobal.com. The Claims Agent is not permitted to provide legal advice.

## ARTICLE VI
## <u>CERTAIN RISK FACTORS TO BE CONSIDERED</u>

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE COMBINED DISCLOSURE STATEMENT AND PLAN AND ASSOCIATED DOCUMENTS. THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, HOWEVER.

### 6.1    **The Plan May Not Be Accepted**.

The Debtor can make no assurances that the requisite acceptances to the Plan will be received, and the Debtor may need to obtain acceptances to an alternative plan for the Debtor, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estate under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in the Plan.

6.2     **The Plan May Not Be Confirmed**.

There is no assurance that the Bankruptcy Court will confirm the Plan. Even if the Bankruptcy Court determined that the Combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met. Moreover, there can be no assurance that modifications to the Combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what Distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests under a subsequent plan or in a subsequent liquidation.

6.3     **Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections**.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for Distribution to such Class may differ from the Debtor's estimates. If the total amount of Allowed Claims in a Class is higher than the Debtor's estimates, or the funds available for Distribution to such Class are lower than the Debtor's estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

6.4     **The Bankruptcy Court May Disagree with the Classification of Claims**.

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests. The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtor believes that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtor would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtor will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member. The Debtor

46

believes that it would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtor believes that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

6.5     **Failure to Consummate the Plan**.

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

6.6     **Plan Releases May Not Be Approved**.

There can be no assurance that the releases, as provided in Article VIII of the Plan, will be granted. Failure of the Bankruptcy Court to grant such relief may result in a chapter 11 plan that differs from the Plan or the Plan not being confirmed.

6.7     **Risks upon Confirmation.**

Even if the Plan is consummated, the Debtor will continue to face risks, including certain risks that are beyond its control, such as further deterioration or other changes in economic conditions, changes in the industry, regulatory changes, and potential revaluing of its assets due to chapter 11 proceedings, for example. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that the Plan will achieve the Debtor's stated goals. In addition, at the outset of the Chapter 11 Case, the Bankruptcy Code provides the Debtor with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtor will have retained the exclusive right to propose the Plan upon filing its petition. If the Bankruptcy Court terminates that right, however, or if the exclusivity period expires, there could be a material adverse effect on the Debtor's ability to obtain Confirmation of the Plan in order to achieve the Debtor's stated goals. Adequate funds may not be available when needed or may not be available on favorable terms.

6.8     **The Chapter 11 Case May be Converted to Chapter 7, or a Chapter 11 Trustee May be Appointed**.

If the Bankruptcy Court finds that it would be in the best interests of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed

47

or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

Alternatively, if the Bankruptcy Court finds that cause exists or that it would be in the best interest of creditors, equity security holders and other interests of the estate, the Bankruptcy Court may appoint a chapter 11 trustee under section 1104 of the Bankruptcy Code. If appointed, a chapter 11 trustee would assume control over property of the Estate and operation of the Debtor's business. On April 9, 2026, CMB filed a motion [as amended, D.I. 221] (the "CMB Motion") requesting that the Court appoint a chapter 11 trustee to investigate into the Debtor's affairs and identify potential causes of action. The Debtor filed an objection [D.I. 256] to the CMB Motion on April 23, 2026. As more fully set forth in the Debtor's objection, the Debtor believes that appointment of a chapter 11 trustee is inappropriate and unwarranted in this Chapter 11 Case, including because the Debtor's independent special committee already conducted a robust investigation and because CMB is attempting to gain a litigation advantage through the CMB Motion. The independent special committee of the Debtor's board conducted a robust investigation and did not identify any potential causes of action or other issues that would support appointment of a chapter 11 trustee. Accordingly, a chapter 11 trustee in this case would only result in duplicative costs to the estate with no tangible corresponding benefit. The CMB Motion is scheduled for hearing on June 25, 2026, at 10:00 a.m. (ET) concurrently with confirmation.

6.9    **Certain Tax Considerations**.

1. **Overview.**

There are a number of material income tax considerations, risks and uncertainties associated with the Plan described in this document.

The following discussion is a summary of certain material U.S. federal income tax consequences of the Plan to the Debtor and to certain holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), Treasury Regulations promulgated and proposed thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect. No legal opinions have been requested or obtained from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the Internal Revenue Service with respect to any of the issues discussed below. The discussion below is not

48

binding upon the Internal Revenue Service or the Bankruptcy Courts. No assurance can be given that the Internal Revenue Service would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local, or non-income tax consequences of the Plan (including such consequences with respect to the Debtor), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtor within the meaning of the Internal Revenue Code, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, certain former citizens or long-term residents of the United States, broker-dealers, banks, mutual funds, insurance companies, financial institutions, retirement plans, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, Holders of Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy).  Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds such a Claim only as a "capital asset" (within the meaning of section 1221 of the Internal Revenue Code).  This summary also assumes that the Claims against the Debtor will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtor "solely as a creditor" for purposes of section 897 of the Internal Revenue Code (and thus are not subject to withholding under the Foreign Investment in Real Property Tax Act). This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan.  Additionally, this discussion does not address any consideration being received other than in a person's capacity as a Holder of a Claim.

For purposes of this discussion, the term "U.S. Holder" means a Holder of a Claim (including a beneficial owner of a Claim), that is, for U.S. federal income tax purposes, (1) an individual citizen or resident of the United States, (2) a corporation, or other entity treated as a corporation, created or organized in or under the laws of the United States or any state thereof or the District of Columbia, (3) a trust if (a) a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. persons (within the meaning of section 7701(a)(30) of the Internal Revenue Code) have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election under applicable Treasury Regulations to be treated as a U.S. person for U.S. federal income tax purposes, or (4) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other passthrough entity for U.S. federal income tax purposes). In the case of a Holder that is classified as a partnership for U.S. federal income tax purposes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partner or the partnership.  If you are

a partner (or other beneficial owner) of a partnership (or other entity treated as a partnership or other pass-through entity) that is, or will be, a Holder of a Claim, then you should consult your own tax advisors.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO ANY HOLDERS OF CLAIMS. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

2. **Certain U.S. Federal Income Tax Consequences to the Debtor or the Wind-Down Debtor.**

Debtor is currently treated as a as an entity that is disregarded as a separate entity from its parent for U.S. federal income tax purposes. Accordingly, the U.S. federal income tax consequences of consummating the Plan will generally not be borne by the Debtor, but by its direct or indirect owners which are themselves not disregarded entities for U.S. federal income tax purposes.

In general, absent an exception, a taxpayer will realize and recognize cancelation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the sum of (a) the amount of any cash paid, (b) the issue price of any new indebtedness of the debt issued, and (c) the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange; except to the extent that payment of the indebtedness would have given rise to a deduction.

Under section 108 of the Internal Revenue Code, a taxpayer is not required to include COD Income in gross income (1) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"), or (2) to the extent that the taxpayer is insolvent immediately before the discharge (but only to the extent of the taxpayer's insolvency) (the "Insolvency Exception"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income.  In general, tax attributes will be reduced in the following order: (1) net operating losses; (2) most tax credits, including minimum tax credit carryovers; (3) capital loss carryovers; (4) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (5) passive activity loss and credit carryovers; and (6) foreign tax credits.  Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Internal Revenue Code.

Under section 108(d)(6) of the Internal Revenue Code, when an entity that is a flow-through entity (such as the Debtor) realizes COD Income, its owner (if the flow-through entity is a disregarded entity) or members/partners (if the flow-through entity is classified as a partnership for U.S. federal income tax purposes) are treated as receiving their allocable share of such COD

50

Income and the Bankruptcy Exception and the Insolvency Exception (and related attribute reduction) are applied at the owner/member/partner level rather than at the entity level. Accordingly, the Holders of equity in the Debtor will be treated as receiving their allocable share, if any, of the COD Income realized by the Debtor. If a Holder has suspended loss with respect to its equity interest in the Debtor, the allocation of COD Income may allow some or all of such suspended losses to be used to offset the COD Income.

### 3. Tax Consequences to U.S. Holders of Certain Allowed Claims

#### a. Gain or Loss Recognition

A U.S. Holder of Allowed Claims that receives Cash will be treated as receiving payment in a taxable exchange under section 1001 of the Internal Revenue Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest or original issue discount ("OID"), each U.S. Holder of such Claims should recognize gain or loss equal to the difference between the (a) sum of the Cash received in exchange for the Claim, and (b) such U.S. Holder's adjusted basis, if any, in such Claim. A U.S. Holder's ability to deduct any loss recognized on the exchange of its Claims will depend on such U.S. Holder's own circumstances and may be restricted under the Internal Revenue Code.

HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.

#### b. Accrued Interest

A portion of the payment received by Holders of Allowed Claims may be attributable to accrued interest on such Claims or OID. Such amount should be taxable to that U.S. Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtor.

If the payment does not fully satisfy all principal and interest on Allowed Claims, the extent to which payment will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of General Unsecured Claims will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan may be binding for U.S. federal income tax purposes, but certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest and then as a payment of principal. The Internal Revenue Service could take the position that the payment received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED INTEREST.

51

### c.    Market Discount

Under the "market discount" provisions of the Internal Revenue Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of Allowed Claim (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### 4.    Tax Consequences to Non-U.S. Holders of Certain Allowed Claims

The following discussion includes only certain U.S. federal income tax consequences of the payments to Non-U.S. Holders for Claims. The discussion does not include any non-U.S. tax considerations.   The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the payments to such Non-U.S. Holder.

Whether a Non-U.S. Holder realizes gain or loss on the payment of a Claim and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

### a.    Gain or Loss Recognition

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the exchange occurs or who otherwise meets the so-called "substantial presence test" under Section 7701(b)(3) of the Internal Revenue Code, or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S.

Holder's gains allocable to U.S. sources exceed losses allocable to U.S. sources during the taxable year of the exchange.

If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. To claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### b.    Accrued Interest

The United States generally imposes a 30% U.S. federal withholding tax on payments of interest to Non-U.S. Holders. Subject to the discussion below of an interest effectively connected with the conduct of a trade or business within the United State, a Non-U.S. Holder will not be subject to the 30% U.S. federal withholding tax with respect to payments of interest on the notes, provided that:

      (i)     it does not own, actually or constructively, 10% or more of the total combined voting power of all classes of our stock entitled to vote;

      (ii)     it is not a "controlled foreign corporation" with respect to which we are, directly or indirectly, a "related person"; and

      (iii)     it provides its name and address, and certify, under penalties of perjury, that it is not a U.S. person (on a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable form)), or it holds its notes through certain foreign intermediaries and the foreign intermediaries satisfy the certification requirements of applicable Treasury Regulations

If a Holder cannot satisfy the requirements described above, that Holder will be subject to the 30% U.S. federal withholding tax with respect to payments of interest on the notes, unless that Holder provide to the Debtor (or other applicable withholding agent) with a properly executed IRS Form W-8BEN or W-8BEN-E or other applicable form claiming an exemption from or reduction in withholding under the benefit of an applicable U.S. income tax treaty.

If such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

53

c.   **FATCA**

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account Holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of interest on certain types of obligations. FATCA withholding may apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax. U.S. Holders that hold Claims through foreign financial institutions and Non-U.S. Holders are encouraged to consult their tax advisors regarding the possible implications of these rules on their Claim.

### 3.   Information Reporting and Back-Up Withholding

Information reporting requirements may apply to payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24%) with respect to payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

The Debtor, or the applicable agent, will withhold all amounts required by law to be withheld from payments of interest and comply with all applicable information reporting requirements.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING IN THE PLAN WILL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**ARTICLE VII**
**MEANS OF IMPLEMENTING THE PLAN**

In addition to the provisions set forth elsewhere in this Plan, the following constitutes the means of execution and implementation of this Plan.

7.1   **General.**

Upon confirmation of the Plan, and in accordance with the Confirmation Order and subject to the Wind-Down Budget, the Debtor or the Wind-Down Debtor, as applicable, will be authorized

to take all necessary or appropriate steps, and perform all necessary or appropriate acts, to consummate the terms and conditions of the Plan, including, as applicable, consummation of the Wind Down and Sale Transaction, the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or other corporate transactions. Such actions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state law; and (d) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

### 7.2    Sale Transaction & Sources of Consideration for Plan Distributions

The Wind-Down Debtor will fund distributions under the Plan with collateral of the Prepetition Lender and DIP Lender, comprised of Cash held on the Effective Date by or for the benefit of the Debtor or the Wind-Down Debtor, including the remaining Net Sale Proceeds due and payable under the Purchase Agreement(s) and Sale Order(s) after the Closing Date, the Net Residual Asset Proceeds assets held by the Wind-Down Debtor, and the assumption of liabilities by the Purchaser(s) under the Purchase Agreement(s) and Sale Order(s). Distributions in the form of additional indemnification retainers will also be funded under the Former Manager Settlement. The Debtor has also offered to grant certain releases to Holders of Claims that vote to accept and opt into the releases contained in the Plan. Notwithstanding anything to the contrary in this Plan, on the Effective Date, any Cause of Action not settled, released, enjoined, or exculpated under Article VIII hereof on or prior to the Effective Date will vest in the Wind-Down Debtor and will be subject to administration by the Plan Administrator.

### 7.3    Wind-Down Debtor

The Debtor will continue in existence after the Effective Date as the Wind-Down Debtor for purposes of (a) winding down the Debtor's business and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtor after the Effective Date and after the consummation of the Sale Transaction(s); (b) performing the Debtor's obligations under the Purchase Agreement(s) or any transition services agreement entered into on or after the Effective Date by and between the Debtor and the Purchaser(s), if any; (c) resolving any Disputed Claims; (d) paying or otherwise satisfying Allowed Claims; (e) filing appropriate tax returns; and (f) administering the Plan in an efficient manner. The Wind-Down Debtor will be deemed to be substituted as the party in lieu of the Debtor in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forum, or administrative proceedings outside of the Bankruptcy Court, including

55

all disputes with CMB, in each case without the requirement or need for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

Upon the Effective Date, (i) the Debtor's board of managers will be deemed to have resigned, and (ii) any Estate non-Cash assets will vest in the Wind-Down Debtor in accordance with the terms of this Plan. The Wind-Down Debtor shall use the Wind-Down Funds, subject to the Wind-Down Budget, as well as any other Estate non-Cash assets remaining, for the purpose of administering the Estate and consummating the Plan.  Any distributions to be made under the Plan from such assets will be made by the Plan Administrator or its designee.  The Wind-Down Debtor and the Plan Administrator will be deemed to be fully bound by the terms of the Confirmation Order.

### 7.4    Funding of the General Unsecured Convenience Class Claim Fund.

As a result of the compromises and settlements under the Plan and the releases granted in consideration thereof, the DIP Lender and Prepetition Lender have each agreed to permit holders of Allowed General Unsecured Convenience Class Claims to receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claims, the General Unsecured Convenience Class Claim Fund, which provides for the distributions set forth in Article III of the Plan and the value of which the DIP Lender or the Prepetition Lender, as applicable, would otherwise be entitled to receive as part of its recovery on account of the DIP Claim or the Prepetition Lender Claim pursuant to section 1129(b)(2) of the Bankruptcy Code, as applicable.

### 7.5    The Former Manager Settlement.

Under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates the Former Manager Settlement among the Debtor and the Former Managers, which reflects a good faith, arms'-length compromise and settlement of issues between or among them, all as more fully described in the Former Manager Settlement.

The Former Manager Settlement is designed to achieve a reasonable economic settlement of the Former Manager Claims. The entry of the Combined Order shall constitute the Bankruptcy Court's approval of the Former Manager Settlement, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, its Estate, its creditors, and other parties-in-interest, and are fair, equitable, and within the range of reasonableness in accord with the standard established by applicable law. The provisions of the Former Manager Settlement are non-severable from each other and from the remaining terms of the Plan, as they relate to the Former Manager Settlement. To the extent there are any inconsistencies between the Plan and the Former Manager Settlement, the terms of the Former Manager Settlement control.

### 7.6    Wind-Down.

After the Effective Date, the Plan Administrator and Wind-Down Debtor may take all actions, subject to the Wind-Down Budget, they deem necessary or appropriate to effect any transactions approved by, contemplated by, or necessary to effectuate the terms of this Plan.

7.7    **Approval and Authorization of Corporate and Company Action.**

Under the Plan, upon the Effective Date, all corporate actions contemplated by the Plan will be deemed authorized and approved in all respects, including (i) the selection of a Plan Administrator, (ii) the Distributions pursuant to the Plan, and (iii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case unless otherwise provided in the Plan. All matters provided for under the Plan involving the entity structure of the Debtor and Wind-Down Debtor or corporate and company action to be taken by or required of the Debtor or the Wind-Down Debtor will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such documents, and will be authorized, approved, adopted and, to the extent taken prior to the Effective Date, ratified and confirmed in all respects and for all purposes without any requirement of further action by Holders of Claims or Interests, managers of the Debtor or the Wind-Down Debtor, as applicable, or any other Person.

After the Effective Date, the Debtor will continue to exist as the Wind-Down Debtor for Plan Distribution purposes. At any time after the Effective Date, the Plan Administrator will be authorized to dissolve the Debtor upon filing a notice of such dissolution with the Bankruptcy Court, notwithstanding any requirements of applicable state law.

7.8    **Plan Administrator.**

(b)    **Appointment**. The Plan Administrator will be appointed by the Debtor, in consultation with the Prepetition Lender. The appointment of the Plan Administrator will be effective as of the Effective Date. Any successor Plan Administrator(s) will be appointed in accordance with this Plan.

(d)    **Powers and Duties**. The Plan Administrator will act for the Wind-Down Debtor in the same fiduciary capacity as applicable to a board of directors, officers, and managers, subject to the provisions hereof (and all certificates of incorporation, bylaws, shareholder agreements, and related documents are deemed amended by the Plan to permit and authorize same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers and officers of the Debtor will be deemed to have resigned, solely in their capacities as such, and the Plan Administrator will succeed to the powers of the Debtor's directors, officers, and managers. From and after the Effective Date, the Plan Administrator will be the sole representative of, and will act for, the Wind-Down Debtor. For the avoidance of doubt, the foregoing will not limit the authority of the Wind-Down Debtor or Plan Administrator, as applicable, to continue the employment of any former director, officer, employee, or other agent or representative.

The powers of the Plan Administrator will include any and all powers and authority to implement the Plan and to make distributions thereunder and wind down the business and affairs of the Debtor and the Wind-Down Debtor, as applicable, including, without limitation:

(i)    to exercise all power and authority that may be or could have been exercised, commence all proceedings that may be or could have been commenced and take all actions that may be or could have been taken by the Debtor with like effect as if authorized, exercised and taken by unanimous action of the Debtor's partners, members, officers, directors and shareholders, including, without limitation,

57

amendment of the certificates of incorporation and by-laws of the Debtor, the dissolution of the Debtor and the assertion or waiver of the Debtor's attorney/client privilege;

(ii)     to open and maintain bank and other deposit accounts, escrows and other accounts, calculate and implement Distributions to Holders of Allowed Claims as provided for or contemplated by the Plan and take other actions consistent with the Plan and the implementation thereof, including the establishment, re-evaluation, adjustment and maintenance of appropriate Reserves in accordance with this Plan, in the name Wind-Down Debtor, even in the event of the dissolution of the Debtor;

(iii)    subject to the applicable provisions of the Plan including the Releases, to collect and liquidate all Residual Assets pursuant to the Plan, to make Distributions generated by the sale or disposition of Residual Assets and to administer the winding-up of the affairs of the Debtor;

(iv)    to borrow funds and replenish the Reserves and to take all actions necessary to preserve the Estate;

(v)     to object to any Claims (Disputed or otherwise), and to defend, compromise and/or settle any Claims prior to or following objection without the necessity of approval of the Bankruptcy Court;

(vi)    to litigate any and all Causes of Action that are not resolved by this Plan;

(vii)   to make decisions, without further Bankruptcy Court approval, regarding the retention or engagement of professionals, employees and consultants by the Wind-Down Debtor or Plan Administrator, including (i) the charges incurred on or after the Effective Date for services of professionals, without application to the Bankruptcy Court, and (ii) disbursements, expenses or related support services relating to the winding down of the Debtor and implementation of the Plan, without application to the Bankruptcy Court;

(viii)  to cause, on behalf of the Debtor, the Wind-Down Debtor, and its Estate, all necessary tax returns and all other appropriate or necessary documents related to municipal, State, Federal or other tax law to be prepared and filed timely, in accordance with the Plan; *provided*, that the Plan Administrator, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of the Debtor or its Estate for any tax incurred during the administration of the Debtor's Chapter 11 Case, as determined under applicable tax laws;

(ix)    to enter into, execute, or act as a signatory for any agreement or document required by or consistent with the Plan and perform all of the obligations of the Debtor or the Wind-Down Debtor under the Plan;

58

(x)      to abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization, any assets that the Plan Administrator reasonably determines do not benefit creditors of the Debtor or are too impractical to distribute;

(xi)      to investigate (including pursuant to Bankruptcy Rule 2004), prosecute and/or settle any Retained Action, participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction, participate as a party or otherwise in any administrative, arbitrative or other non-judicial proceeding, litigate, or settle such Retained Actions on behalf of the Wind-Down Debtor and pursue to settlement or judgment such actions;

(xii)      to use assets of the Wind-Down Debtor to purchase or create and carry all appropriate insurance policies, bonds or other means of assurance and protection of the Wind-Down Debtor and Plan Administrator and pay all insurance premiums and other costs he or she deems necessary or advisable to insure the acts and omissions of the Plan Administrator and its representatives;

(xiii)      to implement and/or enforce all provisions of this Plan and any Purchase Agreement;

(xiv)      to the extent there is no Sale Transaction, take any and all steps necessary to wind-down or otherwise dispose of the Power Plant;

(xv)      to maintain appropriate books and records (including financial books and records) to govern the distributions under the Plan;

(xvi)      as and to the extent set forth in Article II hereof, to pay fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and to file with the Bankruptcy Court and serve on the U.S. Trustee quarterly post-confirmation financial reports for each of the Debtor until such time as such reports are no longer required, the Bankruptcy Court orders otherwise, a final decree is entered closing this Chapter 11 Case, or this Chapter 11 Case is converted or dismissed;

(xvii)      to dissolve the Wind-Down Debtor if the Plan Administrator reasonably determines that the expense of administering the Wind-Down Debtor so as to make a final Distribution to Holders of Allowed Claims is likely to exceed the value of the remaining assets;

(xviii)      to establish and fund, with any appropriate assets of the Wind-Down Debtor, one or more liquidating trusts to the extent the Plan Administrator determines it is necessary or appropriate;

(xix)      to seek a final decree closing the Chapter 11 Case; and

(xx)      to do all other acts or things that the Plan Administrator deems reasonably necessary or desirable with respect to implementing the Plan.

59

(e) **Compensation**. The Plan Administrator's compensation, on a post-Effective Date basis, will be as described in the Plan Supplement and subject to the Wind-Down Budget.

(f) **Post Effective Date Reserve**. The Plan Administrator will be authorized to establish and fund a Post Effective Date Reserve, subject to the Wind-Down Budget, with an amount of Cash, inclusive of the Wind-Down Amount, that the Plan Administrator determines is necessary or appropriate to satisfy future costs and expenses for and discharge of its duties hereunder. The Post Effective Date Reserve will be used by the Plan Administrator solely to satisfy the Distributions set forth in the Plan and the expenses of the Wind-Down Debtor and the Plan Administrator as set forth in the Plan. The Plan Administrator is authorized, but not directed, in accordance with its business judgment, to establish and fund one or more reserves, which will be deemed part of the Post Effective Date Reserve, in specific amounts from the Post Effective Date Reserve as he determines is necessary or appropriate to discharge his duties and make distributions under the Plan. In no event will the Plan Administrator be required or permitted to use his personal funds or assets for any purposes.

(g) **Limitation of Liability; Exculpation of Plan Administrator**. The Plan Administrator and all professionals retained by the Wind-Down Debtor or Plan Administrator, as applicable, each in their capacities as such, will be deemed exculpated and indemnified by the Wind-Down Debtor. The Plan Administrator and any such professionals may rely upon written information previously generated by the Debtor.

(h) **Successor Plan Administrator(s)**. The Plan Administrator may resign at any time upon 30 days' written notice filed with the Bankruptcy Court; *provided*, that such resignation will only become effective upon the appointment of a permanent or interim successor Plan Administrator. The Prepetition Lender or its designee may, on written notice (which notice may be delivered by email), remove the Plan Administrator, with or without cause. Any successor Plan Administrator shall be selected by the Prepetition Lender or its designee. Upon its appointment, the successor Plan Administrator, without any further act, will become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtor and the Wind-Down will be terminated.

7.9 **Cancellation of Existing Securities and Agreements**.

Except as otherwise provided in this Plan, and in any contract, instrument or other agreement or document created in connection with this Plan, on the Effective Date, the Interests and any other promissory notes, share certificates, whether for preferred or common stock (including treasury stock), other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, and commitments, including, without limitation, any agreements purporting to relate to deferred compensation that relate to Interests or options, will be deemed cancelled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtor under the notes, share certificates, and other agreements and instruments governing such Claims and Interests will be released; *provided, however*, that the cancellation, release, and discharge of the foregoing will not affect whether a timely Claim made on account of such obligation may become

60

an Allowed Claim; *provided, further, however,* that certain instruments, documents, and credit agreement related to Claims will continue in effect solely for the purpose of allowing the Plan Administrator to make Distributions in accordance with this Plan. The Holders of or parties to such cancelled notes, share certificates, and other agreements and instruments will have no rights against the Debtor, the Estate, and the Wind-Down Debtor or the Plan Administrator arising from or relating to such notes, share certificates, and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to this Plan.

7.10    **Exemption from Certain Transfer Taxes**.

Pursuant to Bankruptcy Code section 1146(a), any transfers from the Debtor to any other Entity pursuant to this Plan will not be subject to any stamp tax or similar tax, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any applicable instruments or documents without the payment of any such tax or governmental assessment this Chapter 11 Case. To the extent that the Sale Transaction(s) have not closed as of the Confirmation Date, the Sale Order(s) will be incorporated and made a part of this Plan, and the transfers contemplated or required under those Sale Order(s) are not subject to transfer taxes to the greatest extent permissible under section 1146 of the Bankruptcy Code.

7.11    **Preservation of Retained Actions**.

Unless a Retained Action against any Entity is expressly waived, relinquished, released, compromised, exculpated, or settled pursuant to this Plan or any Final Order (including the Confirmation Order, and the Sale Order(s), if any), the Debtor expressly reserves such Retained Action to be vested in the Wind-Down Debtor for possible prosecution by the Plan Administrator, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches apply to such Retained Actions upon or after the entry of the Confirmation Order or Effective Date based on the Plan or the Confirmation Order, except where such Retained Actions have been waived, relinquished, released, compromised, exculpated, or settled pursuant to the Plan or any Final Order (including the Confirmation Order and the Sale Order(s), if any). In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtor may enforce all rights to commence and pursue, as appropriate, any and all such Retained Actions, whether arising prior to or after the Petition Date, and the Wind-Down Debtor's rights to commence, prosecute, or settle any such Retained Actions will be preserved notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date.

The failure of the Debtor to list a claim, right, cause of action, suit or proceeding will not constitute a waiver or release by the Debtor or its Estate of such claim, right of action, suit or proceeding. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Retained Actions against them as any indication that the Wind-Down Debtor will not pursue any and all available Retained Actions against them. The Debtor or the Wind-Down Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein, including Article VIII hereof.**

61

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Action that a Debtor may hold against any Entity will vest in the Wind-Down Debtor. In addition, the Wind-Down Debtor reserves the right to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits. After the Effective Date, the Wind-Down Debtor has the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Retained Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court, *provided that*, derivative actions subject to Fed. R. Bankr. P. 7023.1 may only be settled, voluntarily dismissed, or compromised with court approval under Federal Rule of Civil Procedure 23.1(c).

7.12 **Dissolution of the Wind-Down Debtor**.

Upon the conclusion of the Wind-Down, the Plan Administrator is authorized to dissolve the Wind-Down Debtor, without any other or further actions taken by or on behalf of such dissolving Debtor or its shareholders or any payments made in connection therewith, other than the filing of a certificate of dissolution attaching this Plan and the Confirmation Order with the appropriate governmental authorities, pursuant to Section 303 of the Delaware General Corporation Law codified at title 8 of the Delaware Code or other applicable state law. Any remaining assets of the Wind-Down Debtor will be distributed to creditors according to the terms of this Plan and the Confirmation Order.

## ARTICLE VIII
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

8.1 **Release of Liens**.

**Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Secured Claims that the Debtor elects to reinstate or that are treated as reinstated in accordance with Article III hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate will be fully released, settled, compromised, and satisfied, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests will revert automatically to the Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) will be authorized and directed to release any collateral or other property of the Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Wind-Down Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department will constitute good and sufficient evidence of, but will not be required to effect, the termination of such Liens.**

8.2    **Releases by the Debtor**.

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Debtor and the Wind-Down Debtor, each on its own behalf and as a representative of the Estate, will, and will be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or Contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to the Debtor (including the management, ownership, or operation thereof, including as such entities existed prior to or after the Petition Date), the Investigation, the Chapter 11 Case, negotiation, preparation, filing, and consummation of the Wind-Down, Sale Transaction(s), if any, and the DIP Facility, the marketing and sale process related to the Sale Transaction(s), if any, the negotiation, preparation, dissemination, solicitation, and filing of this Combined Disclosure Statement and Plan, the DIP Loan Documents, the filing of the Chapter 11 Case, the settlement of Claims or renegotiation of Executory Contracts or Leases, the pursuit of confirmation of this Combined Disclosure Statement and Plan, the consummation of this Combined Disclosure Statement and Plan, or the administration of this Combined Disclosure Statement and Plan or the property to be Distributed under this Combined Disclosure Statement and Plan, the Wind-Down, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date (including before the Petition Date) related or relating to the foregoing, that may be asserted by or on behalf of the Debtor or its Estate, against any of the Released Parties; *provided* that any right to enforce the Purchase Agreement(s), if any, the Plan, and Confirmation Order is not so released.**

**Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Wind-Down and Sale Transaction(s), if any, and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtor and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to the Debtor or Wind-Down Debtor, or the Debtor's Estate asserting any Claim or Cause of Action released pursuant to the Debtor Release.  For the avoidance of doubt, CMB is not being released or being given a release under this section.**

63

8.3     **Third-Party Release.**

**Effective as of the Effective Date, for good and valuable consideration, including the obligations of the Debtor under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, the adequacy of which is hereby confirmed, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties will be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably, and forever, release, waive, void and extinguish each Debtor, Wind-Down Debtor, and Released Party from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability whatsoever (including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtor and its Estate), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, for any act or omission in connection with, relating to, or arising out of the Debtor (including the management, ownership, or operation thereof, including as such entities existed prior to or after the Petition Date), the Investigation, the Chapter 11 Case, negotiation, preparation, filing, and consummation of the Wind-Down, the Sale Transaction(s), and the DIP Facility, if any, the marketing and sale process related to the Sale Transaction(s), if any, the negotiation, preparation, dissemination, solicitation, and filing of this Combined Disclosure Statement and Plan and the DIP Loan Documents, the filing of the Chapter 11 Case, the settlement of Claims or renegotiation of Executory Contracts or Leases, the pursuit of confirmation of this Combined Disclosure Statement and Plan, the consummation of this Combined Disclosure Statement and Plan, or the administration of this Combined Disclosure Statement and Plan or the property to be Distributed under this Combined Disclosure Statement and Plan, the Wind-Down, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date (including before the Petition Date) related or relating to the foregoing; *provided* that any right to enforce the Purchase Agreement(s), if any, the Plan, and Confirmation Order is not so released; *provided further, however,* that notwithstanding anything to the contrary herein, the provisions of this Section 8.3 will not apply with respect to any unimpaired Claim until such unimpaired Claim has been paid in full in the Allowed amount of such Claim determined in accordance with applicable law, or on terms agreed to between the holder of such Claim and the Plan Administrator or the Debtor, at which time this Section 8.3 will apply in all respects as to the applicable unimpaired Claim.**

**Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Section 8.3 hereof, which includes by reference each of the related provisions and definitions contained in this Plan, and further, will constitute the Bankruptcy Court's finding that each release described in Section 8.3 is: (1) by virtue of the opt-in procedure, fully consensual; (2) in exchange for the good and valuable consideration provided by the Released Parties; (3) a good-faith settlement and compromise of claims released; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property, released pursuant to the releases described herein.  For the avoidance of doubt, CMB is not being released or giving a release under this section.**

64

8.4     **Exculpation**.

**Notwithstanding anything to the contrary herein, effective as of the Effective Date, the Exculpated Parties will neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Entity for any claims or Causes of Action arising prior to or on the Effective Date (including prior to the Petition Date) for any act taken or omitted to be taken in connection with, or related to, preparing and filing the Chapter 11 Case, or formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the confirmation or consummation of the Sale Transaction or the Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with the Chapter 11 Case, the Investigation, the Disclosure Statement, consummation of the Wind-Down, the Sale Transaction(s), if any, or confirmation or consummation of the Plan, except for actions determined by Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon consummation of the Plan will be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

8.5     **No Liability Pursuant to Section 1125(e) of the Bankruptcy Code**.

**Without in any way limiting the releases and exculpation set forth in Sections 8.2, 8.3, or 8.4 hereof, to the fullest extent permitted by section 1125(e) of the Bankruptcy Code, each of the 1125(e) Parties is hereby entitled to all of the protections and benefits afforded by section 1125(e) of the Bankruptcy Code in connection with such party's solicitation and participation in relation to the Plan.**

8.6     **Injunction**.

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims against or Interests in the Debtor that have been released, satisfied, or are subject to exculpation are permanently enjoined, from and after the Effective Date from taking any of the following actions against, as applicable, the Debtor, the Wind-Down Debtor, the Exculpated Parties, the Released Parties, the 1125(e) Parties, or the Plan Administrator, or the property to be distributed under this Plan:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) on account of or in connection with or with respect to any such Claim or Interest; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order on account of or in connection with or with respect to**

65

any such Claim or Interest; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind on account of or in connection with or with respect to any such Claim or Interest; (iv) asserting any right of setoff, directly or indirectly, on account of or in connection with or with respect to any such Claim or Interest, except as contemplated or allowed by this Plan, the Sale Order [D.I. 184], or pursuant to a timely filed Proof of Claim (for the avoidance of doubt, nothing herein shall enjoin or otherwise prohibit any Governmental Unit from filing Proof(s) of Claim by the Governmental Bar Date); and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their Related Parties will be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions, treatment, or reinstatement of such Claim or Interest, as applicable, pursuant to the Plan will be deemed to have consented to the injunction provisions set forth in Section 8.6 hereof. For the avoidance of doubt, the injunction provided for in this section does not affect CMB or any CMB litigation. Notwithstanding anything herein to the contrary, pursuant to section 1141(d)(3) of the Bankruptcy Code, the Debtor shall not receive a discharge.

8.7    **Consensual Non-Debtor Releases**.

Nothing in the Plan is intended to, nor will the Plan be interpreted to, effect a nonconsensual release by a Holder of a Claim or Interest in favor of a party that is not a Debtor, it being acknowledged that such Holder will be deemed to release a party that is not a Debtor under the Plan solely to the extent that such holder consensually elects to provide such Plan release in accordance with the opt-in release procedures set forth in any applicable Ballot or notice.

8.8    **Indemnification Obligations**.

Subject to the occurrence of the Effective Date, the obligations of the Debtor as of the Effective Date to indemnify, defend, reimburse, or limit the liability of the current and former directors, managers, officers, employees, attorneys, other professionals and agents of the Debtor, respectively, against any claims or Causes of Action under any indemnification provisions or applicable law, will survive Confirmation, will be assumed by the Debtor and assigned to the Wind-Down Debtor, which will be deemed to have assumed the obligation, and will remain in effect after the Effective Date if such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before the Effective Date; *provided* that, notwithstanding anything to the contrary herein, the Wind-Down Debtor's obligation to fund such indemnification, defense, or reimbursement obligations will be limited to the extent of available funds under any applicable insurance policies, including any directors and officers insurance policies; *provided further that* the foregoing will not apply to (a) the Former Manager Claims, which are to be treated in accordance with the Former Manager Settlement and (b) Mr. Manski, whose claims are to be treated in accordance with the Manski Settlement. For the avoidance of doubt, neither the Debtor nor the Estate will have any obligation to reimburse such indemnity or defense claims or expenses, other than with respect to the Former Managers under the Former Manager Settlement (as to reimbursement solely from any retainers on hand, payment of any

additional retainers required under Section 4 of the Former Manager Settlement, or as to any monies payable from the Indemnification Escrow Account).

8.9 **Setoffs**.

Except for Claims expressly Allowed hereunder, on or after the Effective Date, the Wind-Down Debtor, may, pursuant to applicable law (including section 553 of the Bankruptcy Code), offset against any Claim, including an Administrative Claim, before any Distribution is made on account of such Claim, any and all of the claims, rights and Causes of Action of any nature that the Debtor or the Wind-Down Debtor may hold against the Holder of such Claim.

8.10 **Binding Effect**.

This Plan will be binding upon and inure to the benefit of the Debtor, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Wind-Down Debtor and the Plan Administrator.

8.11 **Terms of Injunctions or Stays**.

Unless otherwise provided in this Plan, all injunctions or stays provided for in this Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until this Chapter 11 Case is closed.

**ARTICLE IX**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

9.1 **Rejection of Executory Contracts and Unexpired Leases**.

Except as otherwise provided in the Confirmation Order, this Plan, any other Plan Document, the Sale Order(s), if any, the Bar Date Order, or any other relevant order of the Bankruptcy Court, the Confirmation Order constitute an order under section 365 of the Bankruptcy Code rejecting all prepetition Executory Contracts or Leases to which the Debtor is a party, to the extent such contracts or leases are Executory Contracts or Leases, on and subject to the occurrence of the Effective Date, unless (a) such contract or lease is expressly assumed hereunder or was previously assumed or assumed and assigned by the Debtor, or (b) is the subject of a pending motion to reject on the Confirmation Date; *provided, however*, that as to all policies and agreements giving rise to insurance in favor of the Debtor or its Estate, the Debtor believes that the insurance agreements of the Debtor are not Executory Contracts or Leases and therefore are not subject to assumption or rejection; *provided further that* all management agreements with the Debtor's board of managers will be deemed terminated upon their resignations under section 7.3 of the Plan, and will thus be neither assumed nor rejected. To the extent that an insurance policy or agreement is determined to be an Executory Contract or Lease subject to assumption by the Debtor, such executory insurance policy or agreement, as the case may be, is hereby assumed and assigned to, and will vest with, the Wind-Down Debtor. For the avoidance of doubt, all insurance policies and agreements of the Debtor, and all obligations of the Debtor and the other counterparties thereto, will be unaffected by the Plan and will remain enforceable according to their terms and applicable law.

9.2 **Supplemental Bar Date for Rejection Damages**.

If the rejection of any Executory Contract or Lease under this Plan gives rise to a Claim by the non-Debtor party or parties to such Executory Contract or Lease, such Claim, to the extent that it is timely filed and is an Allowed Claim, will be classified in Class 6; *provided, however*, that any potential General Unsecured Claim arising from such rejection will be forever barred and will not be enforceable against the Debtor, the Wind-Down Debtor, and their successors or properties, unless a proof of such Claim is filed and served on the Debtor or the Wind-Down Debtor, as applicable, within thirty (30) days after the date of notice of the entry of the order of the Bankruptcy Court rejecting the Executory Contract or Lease (which may include the Confirmation Order).

## ARTICLE X
## DISTRIBUTIONS

10.1 **Distributions for Claims Allowed as of the Effective Date**.

Except as otherwise provided herein, and only after the funding of the Reserves, or as ordered by the Bankruptcy Court, all Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date will be made on a Distribution Date. Distributions on account of Claims that first become Allowed Claims after the Effective Date will be made pursuant to the terms and conditions of this Plan. Notwithstanding any other provision of this Plan to the contrary, no Distribution will be made on account of any Claim or portion thereof that (i) has been satisfied after the Petition Date pursuant to an order of the Bankruptcy Court; (ii) is listed in the Schedules as contingent, unliquidated, disputed or in a zero amount, and for which a Proof of Claim has not been timely filed; or (iii) is evidenced by a Proof of Claim that has been amended by a subsequently filed proof of Claim that purports to amend the prior Proof of Claim.

10.2 **No Distributions on Disputed Claims**.

No Distribution will be made by the Wind-Down Debtor with respect to a Disputed Claim until the same, or some portion thereof, becomes an Allowed Claim.

10.3 **Distributions on Claims Allowed after the Effective Date**.

Payments and Distributions from the Wind-Down Debtor to each respective Holder on account of a Disputed Claim, to the extent that such Disputed Claim ultimately becomes an Allowed Claim, will be made in accordance with provisions of this Plan that govern Distributions to such Holders of Allowed Claims. Except as otherwise provided in this Plan, within ninety (90) days after such Disputed Claim becomes an Allowed Claim, the Wind-Down Debtor will distribute to such Holder any property from the applicable Reserve or the Wind-Down Debtor that would have been distributed on the dates Distributions were previously made to Holders of Allowed Claims if such Disputed Claim had been an Allowed Claim on such dates.

All Distributions made under this Article X on account of an Allowed Claim will be as if such Disputed Claim had been an Allowed Claim on the dates Distributions were previously made to Holders of Allowed Claims included in the applicable Class.

10.4 **Objections to and Estimation of Claims**.

Unless otherwise provided in this Plan, after the Effective Date, the Wind-Down Debtor has sole and exclusive standing to object to Claims in order to have the Bankruptcy Court determine the amount and treatment of any Claim. From and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. Except as otherwise provided in this Plan, if a party files a Proof of Claim and (i) the Debtor or the Wind-Down Debtor, as applicable, files an objection to that Claim or otherwise formally challenge the Claim or (ii) the Claim otherwise is a Disputed Claim under this Plan, then such Claim will be Disputed unless Allowed or Disallowed by a Final Order or as otherwise set forth in this Plan. Except as otherwise provided in this Plan, and, for the avoidance of doubt, without prejudice to the right of Governmental Units to file Proofs of Claim by the Governmental Bar Date, all Proofs of Claim filed after the Effective Date will be Disallowed and forever barred, estopped, and enjoined from assertion, and will not be enforceable against the Debtor or the Estate, without the need for any objection by the Plan Administrator or any further notice to or action, order, or approval of the Bankruptcy Court.

10.5 **Delivery of Distributions and Undeliverable or Unclaimed Distributions**.

(a) *Delivery of Distributions in General*.

Distributions to Holders of Allowed Claims will be made at such Holder's Distribution Address. Distributions will be made from the Wind-Down Debtor in accordance with the terms of this Plan.

In making Distributions under this Plan, the Plan Administrator may rely upon the accuracy of the claims register maintained by the Claims Agent in the Case, as modified by any Final Order of the Bankruptcy Court disallowing Claims in whole or in part.

(b) *Undeliverable and Unclaimed Distributions*.

If the Distribution to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise an Unclaimed Distribution, no further Distributions will be made to such Holder unless and until the Plan Administrator is notified in writing of such Holder's then-current address, at which time all missed Distributions will be made to such Holder without interest. If a Distribution is returned as undeliverable, the Plan Administrator will use reasonable efforts to determine such Creditor's then-current address. Unclaimed Distributions will be returned to the Wind-Down Debtor until such Distributions are claimed.

(c) *Treatment of Unclaimed Distributions*.

Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an Unclaimed Distribution within three (3) months after the final Distribution Date will be deemed to have forfeited its Claim for such undeliverable or unclaimed Distribution and will be forever barred and enjoined from asserting any such Claim for an Unclaimed Distribution against the Debtor and its Estate, the Plan Administrator, the Wind-Down Debtor, and each of their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its and their property. In such cases, any Cash otherwise reserved for Unclaimed Distributions will become

69

the property of the Wind-Down Debtor free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and will be distributed in accordance with the terms of this Plan. Nothing contained in this Plan will require the Debtor or the Plan Administrator to attempt to locate any Holder of an Allowed Claim; *provided*, *however*, that in its sole discretion, the Plan Administrator may periodically publish notice of Unclaimed Distributions.

10.6    **Interest on Claims**.

Except as required by applicable bankruptcy law, postpetition interest will not accrue or be paid on any Claims, and no Holder will be entitled to interest accruing on or after the Petition Date on any Claim. Except as required by applicable bankruptcy law, interest will not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

10.7    **Withholding and Reporting Requirements**.

In connection with this Plan and all Distributions under this Plan, the Plan Administrator will, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan will be subject to any such withholding, payment, and reporting requirements. The Plan Administrator will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. All amounts properly withheld from Distributions to a Holder as required by applicable law and paid over to the applicable taxing authority for the account of such Holder will be treated as part of the Distributions to such Holder.

All Entities holding Claims will be required to provide any information necessary to effect information reporting and withholding of such taxes. No Distribution will be made to or on behalf of such Entity pursuant to this Plan unless and until such Entity has furnished such information. Any property to be distributed pursuant to this Plan will be deemed: (i) pending the receipt of such information in the manner established by the Plan Administrator, an Undeliverable Distribution pursuant to Section 10.5 of this Plan; or (ii) if such information is not received by the deadline established by the Plan Administrator and approved by the Bankruptcy Court upon notice and a hearing, forfeited and treated in accordance with Section 10.5 of this Plan.

Notwithstanding any other provision of this Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to this Plan has sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution will be made to or on behalf of such Holder pursuant to this Plan unless and until such Holder has made arrangements satisfactory to the Plan Administrator for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Plan Administrator in connection with such Distribution. Any property to be distributed pursuant to this Plan will be deemed: (i) pending the implementation of such arrangements, an Undeliverable Distribution pursuant to Section 10.5 of this Plan; or (ii) if such arrangements are not implemented by the deadline established by the Wind-Down Debtor and approved by the

70

Bankruptcy Court upon notice and a hearing, forfeited and treated in accordance with Section 10.5 of this Plan.

10.8    **Miscellaneous Distribution Provisions**.

(a)    *Method of Cash Distributions*.

Any Cash payment to be made by the Wind-Down Debtor pursuant to this Plan will be in U.S. dollars and may be made, at the sole discretion of the Plan Administrator, by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law.  In the case of foreign creditors, Cash payments may be made, at the option of the Wind-Down Debtor, in such funds and by such means as are necessary or customary in a particular jurisdiction.

(b)    *Distributions on Non-Business Days*.

Any payment or Distribution due on a day other than a Business Day will be made, without interest, on the next Business Day.

10.9    *De Minimis Distribution Provisions*.

No Distribution will be required to be made hereunder to any Holder of a Claim unless such Holder is to receive in such Distribution at least $100.  Any such Distribution not made in accordance with the provisions of this Article X will be retained by the Wind-Down Debtor.  Any Distribution not made in accordance with this Article X to such Holder, will be held in trust for the relevant Holder until the date the next Distribution is scheduled to be made to such Holder; *provided, however*, that such subsequent Distribution, taken together with amounts retained hereby, equals at least $100.

10.10    **Distribution Record Date**.

As of the close of business on the Distribution Record Date, the various lists of Holders of Claims and Interests in each of the Classes, as maintained by the Debtor, or its agents, will be deemed closed and there will be no further changes in the record Holders of any of the Claims or Interests.  Neither the Wind-Down Debtor nor the Plan Administrator will have any obligation to recognize the transfer of or sale of any participation in any Allowed Claim that occurs after the close of business on a Distribution Record Date, and will be entitled for all purposes herein to recognize, deal with and distribute only to those Holders of Allowed Claims who are record Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date, as stated on the official claims register.

**ARTICLE XI**
**CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**

11.1    **Conditions to Effective Date**.

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtor in writing:

71

(a)      the Bankruptcy Court has entered the Confirmation Order;

(b)      the Debtor has obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary, in the Debtor's reasonable determination, to implement and effectuate the Plan;

(c)      the Reserves have been established and funded in accordance with the Plan; and

(d)      the Debtor has commenced all transactions contemplated in this Plan in a manner consistent in all respects with the Plan.

## 11.2   **Substantial Consummation**.

"Substantial Consummation" of the Plan, as defined in sections 1101 and 1127 of the Bankruptcy Code, will be deemed to occur on the Effective Date.

## 11.3   **Consequences of Non-Occurrence of Effective Date**.

If the Effective Date does not timely occur, the Debtor reserves all rights to seek an order from the Bankruptcy Court directing that the Confirmation Order be vacated and that this Plan be null and void in all respects.  If the Bankruptcy Court has entered an order vacating the Confirmation Order, the time within which the Debtor may assume and assign or reject all Executory Contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, will be extended for a period of thirty (30) days after the date the Confirmation Order is vacated, without prejudice to further extensions.

### ARTICLE XII
### ADMINISTRATIVE PROVISIONS

## 12.1   **Retention of Jurisdiction**.

Notwithstanding confirmation of this Plan or occurrence of the Effective Date, and except as otherwise provided by applicable law, the Bankruptcy Court will retain such jurisdiction as is legally permissible, including for the following purposes:

(a)      To determine the allowability, classification, or priority of Claims upon objection of the Debtor, the Wind-Down Debtor, the Plan Administrator, or any other party in interest entitled to file an objection, and the validity, extent, priority and nonavoidability of consensual and nonconsensual liens and other encumbrances;

(b)      To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with this Plan or its execution or implementation by any Entity, to construe and to take any other action to enforce and execute this Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of this Plan and all matters referred to herein, and to determine all matters

72

that may be pending before the Bankruptcy Court in the Case on or before the Effective Date with respect to any Entity;

(c)      To protect the property of the Estate, from claims against, or interference with, such property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens on property of the Estate;

(d)      To determine any and all applications for allowance of Professional Fee Claims;

(e)      To determine any Administrative Claims, Priority Tax Claims, Other Priority Claims, or any other request for payment of claims or expenses entitled to priority under section 507(a) of the Bankruptcy Code;

(f)      To resolve any disputes arising under or related to the implementation, execution, consummation or interpretation of this Plan, the Wind-Down, and the making of Distributions hereunder;

(g)      To determine any and all motions related to the rejection, assumption or assignment of Executory Contracts or unexpired leases, or to determine any motion to reject an Executory Contract or unexpired lease;

(h)      To determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Case, including any remands;

(i)      To enter a Final Order closing the Debtor's Chapter 11 Case;

(j)      To modify this Plan under section 1127 of the Bankruptcy Code, to remedy any defect, cure any omission, or reconcile any inconsistency in this Plan or the Confirmation Order so as to carry out its intent and purposes;

(k)      To issue such orders in aid of consummation of this Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Entity, to the full extent authorized by the Bankruptcy Code;

(l)      To enable the Wind-Down Debtor to prosecute any and all proceedings, including to set aside Liens and to recover any transfers, assets, properties or damages to which the Estate may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws except as may be expressly waived pursuant to this Plan;

(m)      To determine any tax liability of the Debtor or the Wind-Down Debtor pursuant to section 505 of the Bankruptcy Code, and to address any request by the Wind-Down Debtor for a prompt audit pursuant to section 505(b) of the Bankruptcy Code;

(n)      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

73

(o)     To resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Case, the Bar Date Order or the otherwise applicable Claims bar date, the hearing to consider approval of the Combined Disclosure Statement and Plan or the Confirmation Hearing;

(p)     To resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in this Chapter 11 Case;

(q)     To authorize sales of assets as necessary or desirable and resolve objections, if any, to such sales;

(r)     To hear and resolve Claims and Retained Actions, as appropriate;

(s)     To resolve any disputes concerning any exculpation of a non-debtor hereunder or the injunction against acts, employment of process or actions against such non-debtor arising hereunder;

(t)     To approve any Distributions, or objections thereto, under this Plan;

(u)     To approve any Claims settlement entered into or offset exercised by the Wind-Down Debtor; and

(v)     To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code.

12.2    **Amendments**.

(a)     *Preconfirmation Amendment.*

The Debtor, in the exercise of its fiduciary duties, may modify this Plan at any time prior to the entry of the Confirmation Order, provided that this Combined Disclosure Statement and Plan, as modified, meet applicable Bankruptcy Code requirements.

(b)     *Postconfirmation Amendment Not Requiring Resolicitation.*

After the entry of the Confirmation Order, but before substantial consummation of the Plan, the Debtor may modify this Plan to remedy any defect or omission or to reconcile any inconsistencies in this Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of this Plan, provided that such modification will not materially and adversely affect the interests, rights, treatment or Distributions of any Class of Allowed Claims or Interests under this Plan.

12.3    **Withdrawal of Plan**.

The Debtor reserves the right to revoke and withdraw or modify this Plan at any time prior to the Confirmation Date in the exercise of its fiduciary duties or, if the Debtor is for any reason unable to consummate this Plan after the Confirmation Date, at any time up to the Effective Date.

74

If the Debtor revokes or withdraws this Plan, (a) nothing contained in this Plan will be deemed to constitute a waiver or release of any claims by or against the Debtor or to prejudice in any manner the rights of the Debtor or any Entity in any further proceeding involving the Debtor and (b) the result will be the same as if the Confirmation Order were not entered, this Plan was not filed and the Effective Date did not occur.

12.4    **Successors and Assigns**.

The rights, benefits and obligations of any Person or Entity named or referred to in this Plan will be binding on, and will inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person or Entity.

12.5    **Governing Law**.

Except to the extent that the Bankruptcy Code, Bankruptcy Rules or other federal laws apply, the rights and obligations arising under this Plan will be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.

12.6    **Corporate Action**.

Any matters provided for under this Plan involving the corporate structure of the Debtor or corporate action, as the case may be, to be taken by or required of the Debtor will be deemed to have occurred and be effective as of the Effective Date and will be authorized and approved in all respects, without any requirement of further action by the Debtor or the Wind-Down Debtor, as the case may be.

12.7    **Effectuating Documents and Further Transactions**.

The Debtor and the Wind-Down Debtor will be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements and take such other actions as they deem necessary to effectuate and further evidence the terms and conditions of this Plan.

12.8    **Confirmation Order and Plan Control**.

To the extent the Confirmation Order is inconsistent with this Plan, the Confirmation Order controls over this Plan.

12.9   **Notices**.

All notices or requests in connection with this Plan will be in writing and will be deemed to have been given when received by mail and addressed to:

**Debtor**:                                                     **Plan Administrator:**

**DLA PIPER LLP (US)**

Aaron S. Applebaum (DE 5587)                    [See Plan Supplement]
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: aaron.applebaum@us.dlapiper.com

David M. Riley (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile: (917) 778-8624
Email: david.riley@us.dlapiper.com

**DEBEVOISE & PLIMPTON LLP**

Rachel Ehrlich Albanese (admitted *pro hac vice*)
66 Hudson Boulevard
New York, New York 10001
Telephone: (212) 909-6000
Facsimile: (212) 909-6836
Email: ralbanese@debevoise.com

12.10   **No Admissions or Waiver**.

Notwithstanding anything in this Plan to the contrary, nothing in this Plan will be deemed to be an admission or waiver by the Debtor with respect to any matter set forth herein, including liability on any Claim or the propriety of a Claim's classification.

[Signature Page Follows]

76

## ARTICLE XIII
## RECOMMENDATION AND CONCLUSION

The Debtor believes that this Combined Disclosure Statement and Plan is in the best interests of the Estate and creditors and urges the Holders of Impaired Claims who are entitled to vote to timely return their Ballots with a vote in favor of this Combined Disclosure Statement and Plan.

**TONOPAH SOLAR ENERGY, LLC**

By:    _/s/ Yale Scott Bogen_
       Name: Yale Scott Bogen
       Title: Chief Restructuring Officer

# EXHIBIT A

## Liquidation Analysis

**Tonopah Solar Energy, LLC**
Liquidation Analysis
Case No. 26-10060 (D. Del.)
*$ in '000s*

| Liquidation Analysis | FN | Chapter 11 Recovery $ | % | Chapter 7 Recovery $ | % |
|---|---|---|---|---|---|
| **Recoverable Assets** | | | | | |
| Net cash from sale of assets | | $6,575.0 | | $6,575.0 | |
| Adequate Assurance - Utility Deposit | | 107.1 | | 107.1 | |
| Refund of Professional Fee Retainers | | 20.0 | | 20.0 | |
| Indemnity escrow | | - | | - | |
| **Total Recoverable Assets** | | **$6,702.1** | | **$6,702.1** | |
| | | | | | |
| **Administrative Fees** | | | | | |
| Plan Administrator | | 330.0 | *100%* | N/A | |
| Chapter 7 Trustee Compensation | | N/A | | 224.3 | *100%* |
| U.S. Trustee Quarterly Fees | | 18.8 | *100%* | 15.8 | *100%* |
| Professional Fees | | 450.0 | *100%* | 470.0 | *100%* |
| DIP claim | | 5,595.8 | *82%* | 5,992.1 | *88%* |
| Other Administrative Fees | | - | | - | |
| **Total Administrative Fees** | | **6,394.6** | | **6,702.1** | |
| **Funds Available for Classes 1 - 8** | | **$307.5** | | **$0.0** | |
| **Class 1 - Other Secured Claims** | | - | *0%* | - | *0%* |
| **Remaining Funds Available** | | **$307.5** | | **$0.0** | |
| **Class 2 - Other Priority Claims** | | - | *0%* | - | *0%* |
| **Remaining Funds Available** | | **$307.5** | | **$0.0** | |
| **Class 3 - Prepetition Lender Claim** | | - | *0%* | - | *0%* |
| **Remaining Funds Available** | | **$307.5** | | **$0.0** | |
| **Class 4 - CMB Secured Claims** | | - | *0%* | - | *0%* |
| **Remaining Funds Available** | | **$307.5** | | **$0.0** | |
| **Class 5 - Former Manager Claims** | [1] | 300.0 | | - | |
| **Remaining Funds Available** | | **$7.5** | | **$0.0** | |
| **Class 6 - General Unsecured Claims** | | - | *0%* | - | *0%* |
| **Remaining Funds Available** | | **$7.5** | | **$0.0** | |
| **Class 7 - General Unsec. Convenience Class Claims** | | 7.5 | *83%* | - | *0%* |
| **Remaining Funds Available** | | **$0.0** | | **$0.0** | |
| **Class 8 - TSE Interests** | | - | | - | |
| **Ending Balance of Funds** | | **$0.0** | | **$0.0** | |

*Footnotes:*
[1] Assumes the Former Managers do not accept the payout option of the settlement. If the Former Managers accept the payout option, instead of the $300,000 distribution from the Debtor, the Former Managers would receive $375,000 from the escrow funds and the remainder of the escrow funds would be paid into the estate and allocated to the DIP lender and, if any funds are still remaining, to the prepetition lender in accordance with the Plan.

## EXHIBIT B

**Former Manager Settlement**

This term sheet (the "***Term Sheet***"), dated as of April 13, 2026, sets forth the principal terms of a settlement of claims between debtor Tonopah Solar Energy, LLC ("***TSE***" or "***Debtor***"), on the one hand, and each of Joseph A. Bondi, Anna Phillips, and Charles C. Reardon (collectively, the "***Former Managers***"), on the other.  TSE and the Former Managers are referred to in this Term Sheet collectively as to the "***Parties***."

THE SETTLEMENT DESCRIBED HEREIN REMAINS SUBJECT TO (I) APPROVAL AS A PLAN SETTLEMENT UNDER BANKRUPTCY RULE 9019 AND (II) THE CONFIRMATION AND EFFECTIVENESS OF SUCH PLAN IN ALL RESPECTS.

THIS TERM SHEET IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 AND 1126 OF TITLE 11 OF THE UNITED STATES CODE (THE "***BANKRUPTCY CODE***").  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY.

<u>Recitals</u>

A.  Prior to the commencement of the 2020 Chapter 11 Case (as defined below), TSE engaged each of the Former Managers, either directly or through affiliated entities, to serve as a manager of TSE.

B.  The Former Managers assert that, under various agreements, the TSE Bylaws, and the TSE Operating Agreement (as amended), TSE was legally obligated to indemnify the Former Managers, to secure and maintain Directors & Officers Liability Insurance to protect them from claims, judgments, and associated costs related to their performance of their duties to TSE, and to advance funds to cover the Former Managers' expenses.  TSE agreed to provide such protection and advancement to all of the Former Managers to the full extent permitted by Delaware law.  TSE agreed to indemnify the Former Managers to the fullest extent permitted by law if any or all of them are a party to, are threatened to be made a party to, or are asked to be a witness in any Proceeding (including a Proceeding by or in the right of the Company to procure a judgment in its favor) against all expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by a Former Manager in connection with the Proceeding.

C.  Under that certain *Agreement for Appointment and Service of Manager of Tonopah Solar Energy, LLC* (the "***Reardon Agreement***"), TSE paid a $50,000 retainer to Asgaard Capital, LLC (the "***Reardon Retainer***"), which was to be applied against "(i) any actual, reasonable, out-of-pocket expenses of [Asgaard Capital] in the drafting and negotiation of [the Reardon Agreement], not to exceed $7,500, and then (ii) the amount due [Asgaard Capital] for [Mr. Reardon's] last three (3) months of the Term, and then (iii) any other unpaid amounts due

by [TSE] under [the Reardon Agreement], or promptly returned to [TSE] if all of the foregoing amounts were already paid in full by the conclusion of the Term." The Reardon Agreement included the rights to indemnification and advancement described in Recital B, above.

D.  Mr. Reardon's term as manager of TSE ended on or about December 18, 2020, when the 2020 Plan (as defined below) became effective and TSE emerged from the 2020 Chapter 11 Case. Shortly after the 2020 Plan became effective, approximately $21,000 of the Reardon Retainer was paid to counsel to Reardon (then the Bryan Cave law firm), for its work in negotiating and drafting the Indemnification Escrow Agreement (as defined below) consistent with the 2020 Plan and to have such Indemnification Escrow Agreement finalized contemporaneously with the 2020 Plan effective date; the invoice for such work was also provided to former counsel to TSE at that time. No amount of the balance of the Reardon Retainer has been returned to TSE. The unused amount of the Reardon Retainer, which the Former Managers assert totaled $29,000, was turned over by Asgaard Capital to the law firm of Bryan Cave (as defined below), a firm that was originally co-counsel for Former Managers Bondi, Phillips, and Reardon, and those funds (to the extent they remained) were transferred to the Baker Donelson law firm (as defined below). Counsel for Mr. Reardon informed counsel for TSE, consistently since 2021, that the funds would not be returned to TSE, but would be turned over to counsel for the Former Managers and added to the funds held to be applied against fees and expenses incurred that TSE is obligated to indemnify. TSE, through its counsel, responded that it did not agree that the Reardon Retainer did not need to be returned.

E.  Under that certain agreement between TSE and Stone Phillips, LLC (the "***Phillips Agreement***"), TSE paid $50,000 to Stone Phillips, LLC (the "***Phillips Retainer***"), "which funds will be held on 'on account' to be applied to our professional fees, charges and disbursements for the Engagement (the 'Initial Cash on Account'). To the extent that this amount exceeds [Stone Phillips, LLC's] fees, charges and disbursements upon the completion of the Engagement, [Stone Phillips, LLC agreed to] . . . refund any unused portion.").

F.  Ms. Phillips's engagement as manager of TSE ended on or about December 18, 2020, when the 2020 Plan became effective and TSE emerged from the 2020 Chapter 11 Case. No amount of the Phillips Retainer has been returned to TSE. The full amount of the Phillips Retainer was turned over by Stone Phillips LLC to Baker Donelson that was a successor to Bryan Cave as co-counsel for Former Managers Bondi, Phillips, and Reardon. Counsel for Ms. Phillips informed counsel for TSE, consistently since 2021, that the funds would not be returned to TSE, but would be turned over to counsel for the Former Managers and added to the funds held to be applied against fees and expenses incurred that TSE is

obligated to indemnify. TSE, through its counsel, responded that it did not agree that the Phillips Retainer did not need to be returned.

G. On July 30, 2020, TSE filed a chapter 11 petition, commencing its original bankruptcy case (the "*2020 Chapter 11 Case*").

H. On September 8, 2020, TSE filed an amended chapter 11 plan in the 2020 Case (the "*2020 Plan*").

I. On December 9, 2020, the Delaware bankruptcy court entered an order confirming the 2020 Plan (the "*2020 Confirmation Order*").

J. Section 10.7 of the 2020 Plan provided, among other things, that TSE's "*Indemnification Obligations*" (as defined in the 2020 Plan) "to a current or former director, officer, manager or employee who was employed by the Debtor in such capacity on or after the Petition Date (including, for the avoidance of doubt, the members of the board of directors, board of managers or equivalent body of the Debtor at any time) shall be deemed assumed effective as of the Effective Date. Each Indemnification Obligation that is deemed assumed pursuant to the Plan shall (a) remain in full force and effect, (b) not be modified, reduced, discharged, impaired or otherwise affected in any way, (c) be deemed and treated as an executory contract pursuant to sections 365 and 1123 of the Bankruptcy Code regardless of whether or not proofs of claim have been filed with respect to such obligations and (d) survive Unimpaired (as defined by the Bankruptcy Code) and unaffected irrespective of whether such indemnification is owed for an act or event occurring before, on or after the Petition Date."

K. Section 10.7 of the 2020 Plan further provided that TSE would establish an escrow, with cash equal to $2,500,000 (the "*Indemnification Escrow Account*"), so that to the extent TSE's advancement and indemnification obligations to the Former Managers were not satisfied by TSE or by any applicable D&O liability insurance policy(ies), the escrowed funds may be utilized for such indemnification obligations. Section 10.7 of the 2020 Plan further provides that "[f]unds remaining in the Indemnification Escrow Account after six (6) years, if any, shall revert to and become property of the Debtor; provided, that (i) the Debtor's obligations under this section 10.7 shall not be limited by nor deemed limited to the balance of the funds held in the Indemnification Escrow Account, and (ii) such reversion shall not take place unless and until any claims that have been asserted and are covered by the Indemnification Escrow Account have been resolved."

L. The Former Managers assert that the Indemnification Escrow Account established pursuant to Section 10.7 of the 2020 Plan was created to cover, among other things, any and all indemnification and insurance obligations of TSE that TSE did not fulfill, but in particular it was intended at that time to protect the Former Managers from any and all costs,

including amounts paid and expenses incurred (including attorneys fees), as a witness or a party or to settle or resolve arbitration or litigation referenced below that was commenced by CMB Infrastructure IX, LP ("**CMB Group IX**"), CMB Infrastructure Investment Group XI, LP ("**CMB Group XI**"), and CMB Export, LLC ("**CMBE**" and, together with CMB Group IX and CMB Group XI, "**CMB**").

M. The Former Managers assert that the "reversion" referenced in Section 10.7 of the 2020 Plan as described above shall not take place unless and until any claims that CMB has asserted, including the *Qui Tam* Action (as defined below), or may assert in the future that may require the Former Managers to incur costs as witnesses or parties, including any judgment or liability, have been released or dismissed and all possible appeals have become final or resolved in such a way that there is no likelihood that any Former Manager will need advancement or indemnification.

N. On December 23, 2020, the Parties, along with Citibank, N.A., as escrow agent, and Mark Manski, who was also a former manager of TSE, entered into an escrow agreement, as contemplated by the 2020 Plan (the "***Indemnification Escrow Agreement***"), thus creating and funding the Indemnification Escrow Account.

O. In connection with the 2020 Case, the Parties agreed that certain litigation commenced by CMB, which included claims against certain "John Doe" and "Jane Doe" defendants,[1] constituted claims that have been asserted and are covered by the Indemnification Escrow Account created under the 2020 Plan.

P. The District Court Action remains open pending arbitration and judicial appeals and possible additional future litigation and/or arbitration.  In addition, CMB, Export, LLC, as relator, brought the Qui Tam Action against TSE, which matter was dismissed but also remains on appeal.[2]  At this point in time, the Parties agree that no "reversion" can take place under section 10.7 of the 2020 Plan, both because six years has not passed since the Indemnification Escrow Account was established and because claims that have been asserted and are covered by the Indemnification Escrow Account have not yet been resolved.

Q. The Indemnification Escrow Agreement provides for the release of escrowed funds pursuant to one or more Joint Release Instructions, a Unanimous Joint Release Instruction, and/or upon receipt by the escrow agent of a Final Determination (each as defined in the

---

[1] *See CMB Infrastructure Group IX, LP et al v. Cobra Energy Investment Finance, Inc. et al.*, Case No. 21-cv-214-CDS-DJA (D. Nev.) (the "**District Court Action**").

[2] *See United States ex rel. CMB Export, LLC v. Tonopah Solar Energy, LLC et al.*, Case No. 20-cv-00196-JCM-DJA (D. Nev.), on appeal at *CMB Infrastructure Investment Group IX, LP, et al. v. Cobra Energy Investment Finance, LLC, et al.*, Case No. 25-5835 (9th Cir.) (the "**Qui Tam Action**").

Indemnification Escrow Agreement). Up to $625,000 may be released by way of Joint Release Instructions executed by TSE and any single Former Manager, or if not executed by TSE, by an Order of the Bankruptcy Court; releases of more than $625,000 to a single indemnitee require a Joint Instruction agreed to by all of the Former Managers[3] and either TSE or as directed by the Bankruptcy Court (or other court of competent jurisdiction).

R. In addition to the indemnification obligations of TSE, any applicable D&O insurance, the Reardon Retainer, the Phillips Retainer, and the Escrow Indemnification Account, TSE also prepaid certain additional legal fee retainers on behalf of certain of the Former Managers (the "***FM Retainers***"). Specifically, TSE funded the following FM Retainers:

    a. In approximately April of 2021, $150,000 for current fees and costs and $450,000 to be held to pay the final bill to the law firm of Williams & Connolly LLP ("***W&C***"), counsel for Former Managers Bondi, Phillips, and Reardon.

    b. Also in approximately April of 2021, $125,000.00 to the law firm of Bryan Cave Leighton Paisner LLP ("***Bryan Cave***"), former counsel for Former Managers Bondi, Phillips, and Reardon.

S. As of January 31, 2026, the following FM Retainers remained:

    a. $288,308.31 held by W&C, counsel for Former Managers Bondi, Phillips, and Reardon ($100,000 of the funds of W&C having been transferred to Baker, Donelson, Bearman, Caldwell & Berkowitz, PC ("***Baker Donelson***")).

    b. $33,783.00 held by Baker, Donelson, counsel for Former Managers Bondi, Phillips, and Reardon.[4]

T. As of the date of this Term Sheet, other than the "John Doe" and "Jane Doe" claims in the District Court Action, and any matters in the *Qui Tam* Action that may implicate the Former Managers as parties or witnesses[5]:

    a. no claims have been asserted against any of the Former Managers, and TSE represents and warrants that it knows of no claims which have been made, or may

---

[3] A release of more than $625,000 to a single indemnitee would also have required agreement by Mr. Manski, but he will no longer be party to the Indemnification Escrow Agreement upon the Bankruptcy Court's approval of his settlement and the release of escrowed funds under that settlement.

[4] The FM Retainers collectively remaining with counsel for Former Managers Bondi, Phillips and Reardon include the unused portion (if any) of the Reardon Retainer and the Phillips Retainer.

[5] For avoidance of doubt, the Debtor asserts that the *Qui Tam* Action cannot implicate the Former Managers as parties and witnesses, as the events at issue in the *Qui Tam* Action transpired before their respective involvements with TSE, but the Debtor agrees that there shall be no reversion of the Indemnification Escrow Agreement funds unless and until the *Qui Tam* Action is finally resolved.

implicate, the Former Managers, other than the claims asserted in the District Court Action; and

    b. CMB has not amended its complaint in the District Court Action or its claims in arbitration to specifically name, nor remove, any of the "John Doe" or "Jane Doe" defendants, but there has been no agreement or ruling, preliminary, final, or otherwise, that (i) claims cannot or will not be asserted against any of the Former Managers, (ii) none of the Former Managers will be called to testify as witnesses, or (iii) the Former Managers will not have to incur attorneys fees or expenses monitoring proceedings related to the District Court Action.

U. On January 21, 2026, TSE filed a second chapter 11 case (the "***Chapter 11 Case***"), through which it seeks to sell its assets and resolve other outstanding assets and liabilities, including with respect to any contingent indemnification obligations to the Former Managers and the Parties' respective rights related to the Indemnification Escrow Agreement, the 2020 Plan, and the FM Retainers.

V. The Former Managers are not current insiders of TSE.

W. On February 4, 2026, TSE filed its bankruptcy schedules in the Chapter 11 Case. Each of the Former Managers was listed on the schedules as a creditor with respect to TSE's ongoing indemnification obligations, which claims were scheduled as contingent and unliquidated and in an unknown amount.

X. On March 16, 2026, the Debtor entered into a separate settlement agreement with Mark Manski, which is subject to bankruptcy court approval under Federal Rule of Bankruptcy Procedure 9019. Under that agreement, the Debtor and Mr. Manski will execute a Joint Release Instruction for the release of $625,000 from the Indemnification Escrow Account, to eliminate Mr. Manski as a party to that Account or the Indemnification Escrow Agreement, and to otherwise resolve all claims between the Debtor and Mr. Manski. Mr. Manski is not a party to this Term Sheet.

**<u>Proposed Settlement of Former Managers' Claims</u>**
**<u>(to be incorporated in a proposed chapter 11 plan in the Chapter 11 Case) (the "*Plan*"):</u>**

1. In exchange for the consideration provided to the Former Managers under this Term Sheet, each Former Manager who agrees to this Term Sheet will have an allowed impaired claim in the Chapter 11 Case that will receive the treatment contemplated by this Term Sheet. Solely for the purposes of plan voting, each Former Manager's allowed impaired claim will be deemed valued at $625,000 and satisfied by the treatment described in this settlement Term Sheet.

2.  Each Former Manager has been given a draft of the Plan (and accompanying disclosure statement) and agrees to vote his or her allowed claim in favor of the 2026 Plan.

3.  On the effective date of the Plan (the "***Effective Date***"), the Debtor will no longer have or owe any indemnification obligations to the Former Managers, other than to approve transfers to the Former Managers pursuant to the Indemnification Escrow Agreement when reasonably requested by the Former Managers, or as described below and set forth in the Plan.

4.  Other than with respect to an individual Former Manager who elects an Alternative Escrow Distribution (defined below) under paragraph 5 of this Term Sheet, the Indemnification Escrow Agreement will remain in place subject to its terms and the terms of the 2020 Plan, as clarified and modified by this Term Sheet (and the final terms of the Plan). To the extent one or more, but not all, of the Former Managers elect an Alternative Escrow Distribution under paragraph 5 below, the Indemnification Escrow Agreement will remain in place subject to its terms and the terms of the 2020 Plan and this Term Sheet (and the final terms of the Plan) as to all Former Managers who do not elect an Alternative Escrow Distribution. For each Former Manager who: (a) votes to accept the Plan; and (b) does not elect an Alternative Escrow Distribution, then on the Effective Date, the Debtor will fund an additional retainer, paid to a law firm designated in writing by the applicable Former Manager, in the amount of $100,000, or $300,000 in total for the three (3) Former Managers (assuming that each of the three (3) Former Managers votes to accept the Plan and does not elect an Alternative Escrow Distribution).

5.  Any Former Manager who votes to accept the Plan may elect, through his or her ballot for voting on the  Plan, an alternative release of $625,000 of escrowed funds (each, an "***Alternative Escrow Distribution***"), of which (a) a portion will be distributed to the electing Former Manager as set forth below (the "***FM Funds***") and (b) the balance will be distributed to the Debtor (the "***TSE Funds***"). The Alternative Escrow Distribution will be documented through execution of a Joint Release Instruction signed by such electing Former Manager and TSE on or as reasonably practicable after the Effective Date. In exchange for executing such a Joint Release Instruction:

    a.  The Debtor will distribute the FM Funds as an additional retainer for the benefit of each electing Former Manager, paid to a law firm designated in writing by the applicable Former Manager, in the amount of $125,000.

    b.  Each such electing Former Manager may, at any time after distribution and in his or her sole discretion, elect to receive any and all retainers, including without limitation any additional retainer, held by counsel on such Former Manager's

behalf, in which case such payment will be treated as taxable income earned by the Former Manager.

c. Each electing Former Manager will retain all rights under and to any applicable D&O liability insurance policy.

d. The TSE Funds will be refunded to the Debtor, subject to the pre- and post-petition liens of TSE's secured lender.

e. If all three Former Managers elect an Alternative Escrow Distribution under the Plan, it will be documented through a Unanimous Joint Instruction, after which the Indemnification Escrow Agreement will be terminated.

6. With respect to any Former Managers who do **not** elect an Alternative Escrow Distribution under paragraph 5 above, all retainers held by or for the benefit of such Former Managers, (i) will be retained by their counsel and applied against reasonably incurred legal costs that would have been covered by TSE's obligations of advancement and indemnification (if not released), and (ii) any unused balance will be refunded to the Debtor, or any successor to the Debtor under the Plan, within five (5) business days after termination of the Indemnification Escrow Agreement.

a. Termination of the Indemnification Escrow Agreement will occur

i. upon final conclusion, including through all appeals, arbitration challenges and confirmations, motions for reconsideration, or the like, of the District Court Action and the *Qui Tam* Action (which eliminates any likelihood that the Former Managers will be involved, as a witness, party or otherwise), in either the District Court Action or the *Qui Tam* Action; or

ii. upon receipt of a full, unconditional, written release of the Former Managers by CMB (including as relator, with respect to the *Qui Tam* Action) and all other co-plaintiffs and other parties to both the District Court Action and the *Qui Tam* Action, which release must include a written binding commitment by all parties that the Former Managers will not be called as witnesses in any proceeding of any type or kind related in any way to their service as TSE managers; as long as in the case of either (i) or (ii); and

iii. by the time of either (i) or (ii), no other claims for which the Former Managers would be entitled to indemnification under their engagement agreements, the TSE Bylaws, or the TSE Operating Agreement (as amended) have been asserted (and if any such claims have been asserted, then either (i) or (ii) must be completed as to such asserted claims).

These items in Section 6(a) being collectively, the "***Final Conclusion.***"

b. Each non-electing Former Manager will provide to the Debtor or any successor to the Debtor under the Plan, copies of all invoices for legal costs (for the Plan Administrator and otherwise attorneys' eyes only and redacted to remove potentially privileged information) proposed to be applied against the retainers within fourteen (14) calendar days after those invoices have been issued. All prior invoices for legal costs and expenses, including the hourly rates and information provided about the hours billed and expenses incurred that have been submitted to the Debtor have been approved. Following the Effective Date, so long as the aggregate of all invoices incurred by the Former Managers in such calendar month does not exceed $15,000, such invoices will not be subject to review or objection by the Debtor/successor. If the Debtor/successor objects to any future payment out of the retainer or any future withdrawal from the Indemnification Escrow Account, the Debtor/successor shall have ten (10) calendar days after receiving a copy of an invoice to provide a written explanation of the basis for its objection to counsel for such non-electing Former Manager. If the Parties are unable to consensually resolve such objection, the Debtor must file with the Bankruptcy Court, or if the Chapter 11 Case is closed, in a Delaware state or federal court of competent jurisdiction, within fourteen (14) calendar days after delivery of the written objection, a motion, petition, or other applicable proceeding challenging that payment. If the Debtor/successor does not file a motion or petition as described above, the Debtor/successor waives any right to challenge such payments. If a payment is challenged, the burden shall be on the Debtor to prove that the payment is not for a cost that is within the indemnification rights of the Former Managers and is not warranted in light of the history of this matter.

c. For the avoidance of doubt, all such non-electing Former Managers will retain all rights under the Indemnification Escrow Agreement and with respect to any applicable D&O liability insurance policy. In addition, promptly after finalization of this Term Sheet, TSE will (i) renew its submission of the indemnification demand of the Former Managers under the applicable insurance policies that provided coverage for the time the Former Managers served in their roles (with counsel to the Former Managers having an opportunity to review such submission and comment on it prior to it being sent) and (ii) submit a claim for reimbursement of all amounts previously paid on account of the Former Managers' indemnification rights, and shall provide any response(s) from any insurer to the Former Managers as soon as they are received.

7. Each Former Manager will execute a Joint Release Instruction reasonably requested by the Debtor, or any successor to the Debtor under the Plan, upon the Final Conclusion.

8. Any Former Manager who does not vote to accept the Plan will retain his or her rights under the Indemnification Escrow Agreement and to any applicable D&O liability insurance policy, but will not receive any additional retainer or be permitted to elect an Alternative Escrow Distribution. All retainers held by or for the benefit of such Former Managers may be applied as set forth in paragraph 6 above, and any unused balance will be refunded to the Debtor, or any successor to the Debtor under the Plan, within seven (7) business days after termination of the Indemnification Escrow Agreement, as set forth in paragraph 6 above.

9. The Debtor retains all its rights with respect to any available insurance coverage, including without limitation with respect to any applicable D&O liability insurance policy under which the Debtor and the Former Managers may be insured.

10. Nothing in the Plan shall abrogate any rights of the Former Managers against any parties other than the Debtor and any successor to the Debtor established under the Plan.

11. Other than the rights and obligations of the Parties set forth in 2020 Plan, as clarified and modified by this Term Sheet (and the final terms of the Plan), and their respective rights and obligations under the Indemnification Escrow Agreement, the Parties (including any successor to the Debtor under the Plan) shall execute complete and mutual releases as of the Effective Date.

12. The Debtor will provide (i) draft(s) of the proposed Plan, and any associated Disclosure Statement, to the Former Managers' counsel sufficiently in advance of their filing with the Bankruptcy Court to allow the Former Managers to review and comment on the same, and (ii) draft(s) of any proposed confirmation order or other document pertinent to confirmation and effectiveness of the Plan.

13. Upon the Effective Date, the Parties agree to work together to the extent reasonably necessary to amend the Indemnification Escrow Agreement consistent with this Term Sheet and the final terms of the Plan.

14. This Term Sheet is conditioned on (a) agreement by and execution of at least two (2) of the three (3) Former Managers and (b) approval by the Bankruptcy Court of Mr. Manski's settlement agreement. The Parties agree that an executed copy of this Term Sheet, redacted as reasonably necessary, may be affixed as an exhibit to the Plan and filed with the Bankruptcy Court.

*[Signature pages follow]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

Tonopah Solar Energy, LLC

By:_____

Name: Yale Scott Bogen
Title: Chief Restructuring Officer

*Execution Version*

**IN WITNESS WHEREOF**, the Parties have executed this Term Sheet as of the date first written above.

**Joseph A. Bondi**

By: _Joseph A. Bondi_
758716AC40274D7...

**Anna Phillips**

By: _Anna Phillips_
3D66D8F16FF54E9...

**Charles C. Reardon**

By: _Charles C. Reardon_
7C795FE72EC343B...

## EXHIBIT C

## Organizational Chart

